Submitted August 10, reversed October 26, 2016

In the Matter of G. A. K.,
a Person Alleged to have a Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

G. A. K.,
*Appellant.*

Multnomah County Circuit Court
15CC01028; A159080

384 P3d 555

Kenneth A. Kreuscher filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Greg Rios, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Flynn, Judge, and DeHoog, Judge.

## SERCOMBE, P. J.

Appellant seeks reversal of a judgment committing her to the custody of the Mental Health Division based on a finding that, because of a mental disorder, appellant was dangerous to others. *See* ORS 426.005(1)(f); ORS 426.130. Appellant contends that the state failed to establish by clear and convincing evidence that she presented a danger to others. As explained below, we agree and, accordingly, reverse.

We state the facts consistently with the trial court's findings. However, as explained in more detail below, the trial court failed to address or make a finding regarding one particular factual issue that we consider to be essential to the issue on appeal and, under the circumstances, we exercise our discretion in this case to take *de novo* review with respect to that factual issue. *See* ORS 19.415(3)(b) ("Upon an appeal in an equitable action or proceeding other than an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record."); ORAP 5.40(8)(d) (among the considerations relevant to the decision whether to exercise discretion to "make one or more factual findings anew on the record" is whether the factual finding in question "is important to the trial court's ruling that is at issue on appeal").

Appellant worked for more than 17 years at American Medical Response (AMR) as an account executive. She has a young daughter and, during the time period at issue, was estranged from and in the process of divorcing her husband, who had problems with drug addiction and had been in jail. In February 2015, appellant began behaving in ways that her friends and coworkers found concerning.

Approximately a week and a half before the commitment hearing in this case, appellant began behaving in an erratic and disruptive manner at work. She came to work with "some writing on her car that was disturbing," looked disheveled, and spoke loudly and abrasively. In a conversation with a coworker that day, she talked about burning down AMR, stating that she was "going to burn down the whole

motherfucking house." According to the coworker, appellant's behavior was out of character. The same day, appellant told another coworker that she had been approached by a man while outside her home the night before. She felt threatened by the encounter, and told her coworker that she had called the police, had a concealed weapon, and wanted to join a gun club.

Appellant's supervisor at work had meetings with her, along with one of her coworkers, to discuss her behavior. According to the supervisor, among the issues to be addressed was appellant's behavior earlier in February where she had been late for a work event and then had made some inappropriate statements—including that, if the supervisor did not pay a particular new hire enough, appellant would "hunt [him] down"—that the supervisor found deplorable and embarrassing. At the meeting regarding that behavior, she described an incident at her in-laws' home, commenting that she had "left rubber in [her] in-laws' driveway" and driven "very fast home with her daughter."

According to the coworker, at the same meeting, appellant told him of some personal issues that she had been having with her estranged husband and "made a comment that she attempted to run her husband over in her car." The coworker elaborated that appellant had told him that "her husband had her daughter somewhere he was not supposed to have her" and that, "when appellant found them," she put her daughter in the car and then attempted to run her husband over. At another meeting in February 2015 regarding her behavior, appellant became angry and abruptly resigned her position. She also told her supervisor that she "flies to Greece once every six months without anybody knowing" and that she "kn[e]w people there."

Approximately a week before the hearing, appellant began sending text messages to a friend saying that she was taking her daughter out of school and going on a road trip, that the federal government was after her, and that there were "20 to 30 unmarked vehicles that were surrounding her house." Around the same time, appellant engaged in bizarre behavior while at a friend's house, including telling the friend that "there's an arsenal stashed on a farm" and

everything is "part of the plan." Appellant did not describe any particular plan, however.

Ultimately, while several friends were present with appellant at one friend's house, another friend called a mental health crisis response line. A mental health responder came to the house, accompanied by a police officer. Appellant was agitated and speaking very loudly, not allowing the responder or officer to get a word in. Her speech seemed "tangential and a little disorganized" to the mental health responder, and, although the responder "couldn't follow [appellant's] train of thought," appellant said "that she was concerned, and she may need to kill someone and she had some weapons stored somewhere." According to the responder, the statements were "very, very ambiguous" and appellant seemed "agitated and anxious and scared," rather than angry or threatening.

Appellant was taken to the hospital that day. She was agitated but was cooperative and did not put up a fight. While at the hospital, appellant called one of her friends, angry at being "locked up," and told the friend that she needed to "watch out" and the friend was "on her list." She also called a coworker and, when she refused to give appellant another AMR employee's telephone number, appellant said, "Don't worry about it, honey, I know where you live."

Appellant testified at the hearing that she did not actually have any firearms in any location. She also testified that she had been joking when she said that she tried to run her husband over and that she had not done so. She confirmed, however, that she had been extremely angry with her estranged husband for taking their daughter unsupervised.

According to the mental health examiners, appellant had a working diagnosis of psychosis, not otherwise specified. One examiner explained that there was "a fair amount of paranoia there, there was grandiosity there," and "there was a clearly paranoid and delusional flavor." Although, under the circumstances, it was "hard to give a more definitive diagnosis other than a psychosis NOS and an affective component," the examiner believed appellant clearly had "a psychiatric diagnosis."

The trial court found that the witnesses who had testified at the hearing were credible. It also observed that appellant is "a very loving, caring person who has been intelligent and productive and rational for all these years, and all of a sudden the last couple of weeks it just all goes out the window." The court found it "striking" that the mental health responder, who was a professional, had not been able to calm appellant during their encounter. In addressing whether defendant was a danger to others, the court found:

> "[T]here are so many statements that I've heard here today that she's made to other people in a[n] erratic and threatening manner, towards wanting to harm people, wanting to kill people, wanting to burn things down, wanting to get guns—so many * * * they all sort of stack up as I look at them all, it causes me great concern about her ability, when she is symptomatic, to control her behavior.

> "There has, fortunately, not been anybody injured at the time. I acknowledge that she's not injured anybody; but her behavior, and her inability to control her behavior when she becomes symptomatic, causes me grave concern that she remains a danger to others today because she's not fully stable."

Accordingly, the court determined that appellant was a danger to others and entered a judgment committing her for a period not to exceed 180 days.

We pause here to address a factual issue—that is, a finding that the trial court did not make. As described, in addition to testimony about appellant's various statements regarding weapons and "wanting to harm people, wanting to kill people, wanting to burn things down," there was testimony from one witness that appellant told him that she had tried to run her estranged husband over with her car. Appellant, though she did not deny making that statement to her coworker, explained that she had not been serious when she made that statement and testified that she had not, in fact, attempted to run her husband over. The trial court found that she had made many threatening statements but had "not injured anybody." It did not specifically address whether she had, in fact, attempted to hit her estranged husband with a car, or had merely talked about doing so, as described in the testimony. In light of the significance that

an actual act of violence would have in this case, along with the tenor of the trial court's other findings (which, in our view, suggest that the trial court did not believe appellant had actually acted violently), we conclude that it is appropriate to exercise our discretion to conduct *de novo* review as to that factual issue. *See* ORS 19.415(3)(b); ORAP 5.40(8)(d); *Frost and Frost*, 244 Or App 16, 22, 260 P3d 570 (2011) (exercising discretion to find certain facts anew on the record). And, given the nature of the testimony from appellant and her coworker, the lack of any corroboration of appellant actually attempting to hit her husband, and the testimony that appellant's mental disorder was, in part, characterized by "grandiosity," the evidence shows only that appellant talked of attempting to hit her husband with a car, but does not show that she actually did so.

We turn, then, to appellant's assignment of error on appeal. She contends that there was not clear and convincing evidence that she was a danger to others. The state, for its part, asserts that "clear and convincing evidence supported the trial court's determination that appellant was a danger to others due to her impaired judgment, paranoid thinking, impulsivity, serious threats, and claims of possessing weapons." Thus, the issue is whether the "facts establish that appellant was a danger to others at the time of the hearing." *State v. D. L. W.*, 244 Or App 401, 403, 260 P3d 691 (2011).

Under ORS 426.005(1)(f), to justify an involuntary civil commitment, the state must prove, by clear and convincing evidence, that a person has a mental disorder and, because of that disorder, is a danger to self, others, or unable to meet his or her basic needs. "The clear and convincing standard is a rigorous one, requiring evidence that is of extraordinary persuasiveness, and which makes the fact in issue highly probable." *State v. M. R.*, 225 Or App 569, 574, 202 P3d 221 (2009) (internal quotation marks omitted).

To support affirmance of a determination that appellant is a danger to others, generally, there must be more than "evidence of appellant's threats of future violence, such as a corresponding overt act demonstrating an intention to carry out the threats or other circumstances indicating that actual

future violence is highly likely." *State v. E. D.*, 264 Or App 71, 74, 331 P3d 1032 (2014) (internal quotation marks omitted). "Whether a person is a danger to others is determined by [her] condition at the time of the hearing in the context of [her] history." *Id.* (internal quotation marks omitted). "Mere verbal threats of violence are generally insufficient to establish danger to others." *Id.* "However, if a mentally ill person has threatened others and has also carried out an overt violent act in the past against another person, those facts generally constitute clear and convincing evidence that the person is a danger to others." *D. L. W.*, 244 Or App at 405; *see also E. D.*, 264 Or App at 74 (we "have found generally that where a mentally ill person has threatened and has committed overt violent acts against others in the past, the clear and convincing standard is met" (internal quotation marks omitted)); *see generally D. L. W.*, 244 Or App at 405 (affirming involuntary commitment based on danger to others in light of "appellant's history of serious verbal threats, and an escalation in the frequency of her erratic, impulsive, and angry conduct, culminating in several recent violent acts"). *But see E. D.*, 264 Or App at 75 (reversing involuntary commitment based on danger to others where the facts were that appellant had committed "one overt violent act—initiating [a] fistfight—and [made] a few vague threats of violence").

Here, appellant's behavior was uncharacteristic and alarming to those who knew her. She made a number of vague but threatening statements, including talking about having weapons, wanting to burn down her workplace, and trying to run over her estranged husband. She also told her boss that she "kn[e]w people" in Greece and, during phone calls from the hospital, told one friend to "watch out" because the friend was "on [appellant's] list" and another that appellant knew where she lived. However, those vague threats, in the absence of any overt act to carry them out, and in the absence of any overt violent act, are insufficient to establish that it is highly likely that appellant would engage in actual future violence. Accordingly, the facts do not support a determination that, as the result of a mental disorder, appellant is a danger to others.

Reversed.