ORTEGA, P.J.
*262 Appellant challenges a judgment of involuntary commitment, assigning error to the trial court's ruling that she was "a person with mental illness." ORS 426.130(1)(a). She asserts that the state did not prove by clear and convincing evidence that, because of her mental disorder, she is "dangerous to [her]self or others." ORS 426.005(1)(f)(A). The state concedes that there is insufficient evidence of danger to self, but argues that commitment of appellant was justified because she was a danger to others. We conclude that the evidence was not legally sufficient to support commitment based on danger to others and, because we also accept the state's concession as to the lack of legally sufficient evidence that appellant was a danger to herself, we reverse.
Neither party requests de novo review and, because this is not an exceptional case, we decline to review based on that standard. See ORAP 5.40(8)(c) (providing that the court will exercise its discretion to review de novo "only in exceptional cases."). Therefore, we review whether the state presented sufficient evidence to support an involuntary civil commitment for legal error. State v. R.E. , 248 Or.App. 481, 483, 273 P.3d 341 (2012). In reviewing the trial court's judgment, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that [commitment]." State v. S.R.J , 281 Or.App. 741, 743, 386 P.3d 99 (2016) (internal quotation marks omitted).
Appellant was diagnosed with bipolar mania by Dr. Eliason, a psychiatrist in Bend. Eliason treated appellant while she was in the hospital and made that diagnosis after a few days of observation. He observed that *693 appellant had lost the need for sleep and exhibited increased energy, fluctuating moods, impulsive behavior, and reality distortion. While at the hospital, appellant made "physical threats" such as "clapping in a menacing manner." She had to be sedated on a couple of occasions because of her impulsive behavior, agitation, and the potential threat to staff, but she was never placed in physical restraints. *263 One of the more troubling issues was appellant's intense response related to her inability to be with her son, who has lived with her parents since she lost custody of him a few years ago. Appellant's mother testified that appellant is fixated on being with her son and that, when she is not allowed to see him, she "gets very violent" and "very upset," but that it does not escalate to physical contact. According to appellant's mother, the most that occurs is that appellant screams and shouts in her face that she wishes her mother were dead. However, appellant has never made a direct threat to kill her mother nor has she ever struck her. On one occasion, about four years before the commitment hearing, appellant hit her father, but since then, appellant's anger had not manifested in physical contact.
Appellant's behavior escalated several months before her commitment when she began calling the Crook County Sheriff's Office numerous times a day to report that her son was being abused by her parents and to request welfare checks. As time passed, the calls became more intense with stating to Sergeant Seaney that she had "the right to shoot anyone that [got] between her and [her son]," although she never threatened him or anyone else in the sheriff's office. Seaney was not exactly sure to whom appellant was referring but knew that she had often described her parents as "being in the way." Seaney heard over dispatch one evening that appellant was in the area of her parents' property and, knowing that he had warned her that going to her parents' property would be trespassing, he went out to stop her. Seaney went to the parents' property, but turned around at the gate because neither appellant nor her parents or son were there. As Seaney was leaving, he encountered appellant in the driveway. He attempted to detain and then search appellant for weapons because of the threatening calls, but she resisted, and he handcuffed her. After the arrest, appellant stated that all she wanted was to see her son. Seaney testified that he confronted appellant about a revoked concealed handgun license permit and whether she had any weapons on her. Appellant responded that she did not "need" a concealed handgun license and that she did not know whether she had any weapons. Seaney conducted a patdown of appellant *264 and searched her car, finding a pocket knife on the floor but no firearm. While Seaney transported appellant to the hospital, she was recorded saying that she wanted to take Seaney's gun and shoot the officers with it, although Seaney did not hear her say that at the time.
In concluding that appellant was a danger to others at the time of the hearing, the court credited the testimony of Eliason, the psychiatrist, and Beachler, an investigator who interviewed appellant at the hospital. They both testified that they believed appellant was a danger to others due to her fixation on reuniting with her son. In keeping with their testimony, the court found that appellant's fixation on getting her son back was affecting her ability to be rational about what was in his best interest, and that her mental disorder was her leading to believe that the people caring for her son were harming him. The court found that, "unless [appellant's] mental illness is kept under control," those caring for her son" are at risk of [her] acting on [her] belief that [they] are harming" him, and it also concluded that appellant was a danger to herself and others.
To justify an involuntary commitment, the state must prove, by clear and convincing evidence, that the individual is "a person with mental illness." ORS 426.130(1)(a). "The clear and convincing evidence standard is a rigorous one, requiring evidence that is of extraordinary persuasiveness, and which makes the fact in issue highly probable." State v. M.R. , 225 Or.App. 569, 574, 202 P.3d 221 (2009) (internal quotation marks omitted). As defined in the statute, a "person with mental illness" is one who, "because *694 of a mental disorder," is "[d]angerous to self or others." ORS 426.005(1)(f)(A). Dangerousness "is determined by [appellant's] condition at the time of the hearing as understood in the context of [her] history." State v. J.K. , 177 Or.App. 373, 377, 34 P.3d 739 (2001).
On appeal, the state concedes that the evidence was insufficient to support a finding that appellant was dangerous to herself. We agree and accept the state's concession. The state, however, asserts that the evidence was sufficient to conclude that, because of appellant's mental disorder, she was dangerous to others. We disagree.
*265 "Given the serious deprivation of liberty and social stigma that are attendant to a civil commitment, and the fact that such a preventive confinement is predicated on a prediction of future behavior, our cases have articulated certain minimum evidentiary standards for commitment." State v. D.R. , 239 Or.App. 576, 582-83, 244 P.3d 916 (2010). Consequently, to affirm the trial court's determination that appellant is dangerous to others, the state must establish "that actual future violence is highly likely." State v. M.A. , 276 Or.App. 624, 629, 371 P.3d 495 (2016) (internal quotation marks omitted). Generally, "threats of future violence" do not meet that standard. State v. E.D. , 264 Or.App. 71, 74, 331 P.3d 1032 (2014) (internal quotation marks omitted). A "corresponding overt act demonstrating an intention to carry out the threats or other circumstances indicating that actual future violence is highly likely" can provide the additional evidence necessary to make a determination of dangerousness to others. Id. (internal quotation marks omitted). Although "[s]pecific acts of violence are not required to establish dangerousness," M.R. , 225 Or.App. at 574, 202 P.3d 221, "[m]ere verbal threats of violence are generally insufficient to establish danger to others." State v. G.A.K. , 281 Or.App. 815, 821, 384 P.3d 555 (2016) (internal quotation marks omitted). Past acts, including verbal acts, can justify a finding of dangerousness, if they "form a foundation for predicting future dangerousness." M.R. , 225 Or.App. at 574, 202 P.3d 221. "However, if a mentally ill person has threatened others and has also carried out an overt violent act in the past against another person, those facts generally constitute clear and convincing evidence that the person is a danger to others." State v. D.L.W. , 244 Or.App. 401, 405, 260 P.3d 691( 2011). An exception to that general rule exists when the overt violent act is "isolated" and "not sufficient to establish that appellant is an ongoing danger to others." E.D. , 264 Or.App. at 75, 331 P.3d 1032.
Although we do not "fact match" in commitment cases, "our case law informs the issue in this case to the extent that it demonstrates how we have interpreted the 'future dangerousness' standard imposed by the law." Id. at 74-75, 331 P.3d 1032 (internal quotation marks omitted). In G.A.K. , *266 we concluded that the appellant's vague but threatening statements, which were alarming to those who knew her, were insufficient to establish dangerousness to others in the absence of any overt act to carry out her threats. 281 Or.App. at 820, 384 P.3d 555 ; see also State v. L.R. , 283 Or.App. 618, 626, 391 P.3d 880 (2017) (holding that threats of violence were insufficient to establish that appellant was a danger to others when "no evidence was presented that [he] had harmed anyone, had attempted to harm anyone, or that any of his broad, vague threats would or could have been carried out"). Further, in E.D. , we held that the record lacked clear and convincing evidence that the appellant was a danger to others because the evidence indicated that he only committed one overt violent act-a fistfight at a treatment center-and had committed no other violent acts in his past, even when considered in the context of verbal threats. Id. at 75, 331 P.3d 1032. Similarly, in State v. S.D.M. , 198 Or.App. 153, 158-59, 107 P.3d 683 (2005), we concluded that the single violent act in the appellant's past-which occurred when the appellant forcibly resisted arrest-was insufficient to prove she was a danger to others.
Here, when we view the record in the light most favorable to the trial court's commitment determination, we conclude the state failed to establish by clear and convincing evidence that, because of appellant's mental disorder, she is a danger to others for the purpose of involuntary commitment, i.e. , *695 depriving appellant of her constitutionally protected liberty interest. We recognize that it is undisputed that appellant's behavior is erratic and impulsive and that she has said she would shoot anyone who interferes with her relationship with her son (giving rise to a reasonable inference that she had her parents in mind when she made the threat). Nevertheless, our case law establishes that verbal threats of that nature without some other evidence that the person would follow through with the threats, even if alarming, cannot establish a foundation for a finding of future dangerousness, which requires a determination that "actual future violence is highly likely." M.A. , 276 Or.App. at 629, 371 P.3d 495. Appellant's isolated physical act of hitting her father several years ago, as in S.D.M , likewise is not sufficient to *267 establish that she is dangerous to others. Accordingly, the state failed to meet its burden.[1]
Reversed.

After the hearing committing appellant to the Oregon Health Authority, the legislature enacted into law (effective on January 1, 2018) a process that allows a law enforcement officer or a family or household member to file a petition requesting that the court issue an extreme risk protection order (ERPO) against a person who the court finds by clear and convincing evidence "presents a risk in the near future, including an imminent risk, of suicide or of causing physical injury to another person." Or. Laws 2017, ch. 737, § 2(1), (6). An ERPO enjoins the person found to present a future risk of causing physical injury to another person or of suicide from "having in the person's custody or control, owning or purchasing, possessing or receiving, or attempting to purchase or receive, a deadly weapon." Id . at § 2(1). We mention this to note the availability of a remedy to address threats of dangerousness other than the process of involuntary commitment and do not, here, decide whether the facts of this case are sufficient to meet the clear and convincing standard that a person presents "a risk" of future dangerousness.