SHORR, J.
*229 Appellant seeks reversal of a judgment committing him for a period not to exceed 180 days, ORS 426.130(1)(a)(C), and an order prohibiting him from purchasing or possessing a firearm, ORS 426.130(1)(a)(D). Appellant challenges the trial court's conclusion that, because of a mental disease or defect, he was a danger to others. ORS 426.005 (1)(f)(A). Because the state failed to present legally sufficient evidence that appellant was a danger to others, we reverse.
Because we do not exercise our discretion to review this case de novo , ORAP 5.40(8)(c), we view the evidence in the light most favorable to the trial court's disposition to determine whether the evidence, when so viewed, was legally sufficient to support appellant's commitment. State v. S. R. J. , 281 Or. App. 741, 743, 386 P.3d 99 (2016) ; State v. M. A. , 276 Or. App. 624, 625, 371 P.3d 495 (2016).
Appellant was civilly committed at a hearing that took place on October 31, 2017. At the time of the hearing, appellant was a 43-year-old man who had had delusional thoughts for at least five years; however, he had never had any psychiatric treatment or diagnosis before his current commitment. Before the hearing, appellant had been living in Oregon for about one month, primarily staying at a shelter, but also staying intermittently with his mother and his daughter. Before moving to Oregon, appellant had been living in California.
For about five years, appellant has harbored a delusional belief that he is being monitored by "the mafia." Appellant's delusion regarding the mafia appears to have originated with his neighbors in California, who he believed were engaged in illegal activities and were monitoring him because he had information on them. Appellant has, at various times, believed that he was being monitored through overhead electrical wires, robotic birds, his daughter's dog's collar, his cell phone, and a surgically implanted pin in his neck. Appellant volunteered that he had been arrested previously for domestic violence and for "carrying a pistol." With regard to the domestic-violence arrest, appellant's mother testified that, six or seven years before the hearing, *230 appellant and his girlfriend had gotten into "a rather violent argument and it resulted in the girlfriend having a broken nose."
When appellant moved to Oregon, he believed that the mafia had followed him from California and was continuing to monitor him in Oregon. Appellant sent his mother photographs of a man at a bus stop, who he believed was a member of the mafia. He also sent his mother photos of "random cars" that he took on his trip to Oregon, for the same purpose. On his first night in Oregon, while staying with his daughter, appellant became convinced that roofers working on a house across the street were monitoring him. That night, appellant asked his daughter to put a handgun on top of the refrigerator "in case anything happened." His daughter refused, but she put an unloaded shotgun under appellant's *454 bed to get him to "calm down and go to sleep."
Appellant's mother got him a new cell phone to "get rid of all of the stuff that might be in that old cell phone," because appellant believed that his phone had been hacked. Appellant then became convinced that his new cell phone was being monitored. The day before appellant was hospitalized, he asked his mother to take him to get a second new cell phone. When she refused, appellant became so agitated that he threw his cell phone against the dashboard of her car and began stomping on it.
The next day, appellant called his mother from a restaurant and said, "I'm ready to deal with this. I'm ready to get these people. Whatever means necessary, I need to do this today." He also told her, "I don't care how I have to do it. I'll kill them. I'll hang them. I'll do whatever I have to. I need to deal with this." Appellant's mother testified that "[t]he whole thing seemed to be escalating." She became so alarmed that she went to the restaurant and convinced appellant to go to Compass Behavioral Health.
At Compass, appellant was verbally disruptive and reiterated his threats against the mafia to the staff; however, he did not try to attack anyone or otherwise become physically aggressive. The Compass crisis team concluded that appellant was a danger to others and needed to be hospitalized. Appellant refused to go to the hospital voluntarily, and *231 the supervisor, Perham, placed a director's hold on appellant and called law enforcement. The officers placed appellant in handcuffs and escorted him to the hospital without further incident.
Perham testified at appellant's commitment hearing. She stated that she had met with appellant and hospital staff several times over the week preceding appellant's commitment hearing. She testified that appellant had no reported incidents of making threats or becoming physically violent with any of the staff. When asked if appellant posed a danger to others, Perham testified as follows:
"If released today, I have concerns about imminent danger to members of the community. I can't identify who they might be because [appellant] has taken pictures of apparently random vehicles associated with people, someone that he saw at a bus stop, identifying those people as part of the group that's surveilling him, following him around, watching his every move. And I have grave concern for the safety of the community because of his delusions."
Perham also testified that she believed outpatient treatment would not be in the best interest of appellant or the community. This conclusion was based, in part, on a statement from appellant's mother that appellant had deceived hospital staff into thinking he had taken his medication when he had not.
Dr. Middlekauff, a psychiatrist who had examined appellant and reviewed the medical records, testified at the hearing. He diagnosed appellant with schizophrenia, and opined that appellant's substance abuse contributed to his symptoms. Appellant admitted to a long history of alcohol, marijuana, and methamphetamine abuse, and he told Middlekauff that he had been in and out of treatment programs for 20 years. Appellant also stated that he had prior arrests for domestic violence and "carrying a pistol," but there was no other evidence about when those arrests occurred or the ultimate outcome. Based on the nursing notes, Middlekauff testified that, while in the hospital, appellant had taken his medication and had not acted out. Middlekauff stated that "the fact that he was able to hold it together and not act out [during his time at the hospital] is *232 in his favor and, I think, he does have control over his behavior. So that is positive in my mind." When asked whether he believed appellant posed a danger to others, Middlekauff said that he had not seen appellant pose a danger to others while in the hospital. Appellant also was not disruptive at the hospital.
Appellant's mother also testified at the commitment hearing. When asked whether she believed appellant posed a danger to others, she said she only knew of one time that appellant had hurt anyone-the domestic violence incident from six or seven years earlier. Appellant's mother stated that she did not believe her son would hurt her if he was not under the influence of alcohol or *455 drugs, but that she was unsure whether or not he would hurt her if he was under the influence. She stated, however, that, if released, appellant would not be welcome to live with her because of his "temperament, volatility, [and] noncompliance."
After hearing all of the testimony, the trial court determined that appellant was a "person with mental illness" because he suffers from a mental disease and because he posed a danger to others.[1] The trial court reasoned as follows:
"[I]t comes down to whether he is dangerous to other people. This illness is long term. It's not disappearing. It's continuing to invade him. And he has made threats in the recent past. He has sought to have his daughter give him a gun to defend himself, apparently, from somebody across the street that he perceived. He got access to, by getting her to give him an unloaded shotgun and putting it under his bed. That's a real dangerous situation and I'm sure his daughter now recognizes the danger of that.
"But the threat, one of the threats that troubles me * * * has to do with other than the threat to use a gun. It's a *233 threat to hang somebody. And I know there is that, the case out there that says it takes more than a threat but where he has gone to the point of seeking the means by which to do somebody ill harm, physical harm by getting a gun and then also has in his mind that he can hang somebody, that is a real danger, danger to other people."
The trial court ordered appellant to be committed to the Mental Health and Developmental Disability Services Division for a period not to exceed 180 days and ordered that he be prohibited from purchasing or possessing firearms.
On appeal, appellant challenges the trial court's conclusion that he is a danger to others. "Given the serious deprivation of liberty and social stigma that are attendant to a civil commitment, and the fact that such a preventive confinement is predicated on a prediction of future behavior, our cases have articulated certain minimum evidentiary standards for commitment." State v. D. R. , 239 Or. App. 576, 582-83, 244 P.3d 916 (2010). To commit a person on the basis that he is a danger to others, the state must establish by clear and convincing evidence "that actual future violence is highly likely." S. R. J. , 281 Or. App. at 749, 386 P.3d 99 (internal quotation marks omitted). "[T]he type of 'danger' necessary to justify an involuntary civil commitment is a narrow range of serious and highly probable threats of harm." Id. The clear and convincing standard of proof "is a rigorous one, requiring evidence that is of extraordinary persuasiveness, and which makes the fact in issue highly probable." State v. M. R. , 225 Or. App. 569, 574, 202 P.3d 221 (2009) (internal quotation marks omitted).
Appellant argues that the record is insufficient to establish that he was a danger to others because the verbal threats that he relayed to his mother to kill unspecified members of "the mafia" were not accompanied by an overt act or other circumstances indicating a high likelihood that he would act on them. The state argues that appellant's threats to kill members of the group he thought were following him, combined with his prior domestic-violence incident, his prior arrest for carrying a firearm, his prior access to his daughter's unloaded shotgun, and the fact that he had taken photographs of strangers and associated them with the group he wanted to kill, amounted to clear and convincing evidence *234 that future harm to others was imminent. For the reasons that follow, we conclude that these facts do not amount to legally sufficient evidence that appellant was a danger to others.
Verbal threats of violence alone are generally insufficient to predict future dangerousness.
*456 State v. Woolridge , 101 Or. App. 390, 395, 790 P.2d 1192, adh'd to as modified on recons. , 102 Or. App. 559, 794 P.2d 1258 (1990). To pass the clear and convincing evidentiary threshold, threats of violence must be accompanied by an "overt act to follow through with the threat" or be made "under circumstances that make actual future violence highly likely." State v. D. R. K. , 216 Or. App. 120, 122, 171 P.3d 998 (2007). Here, there was no evidence that appellant's threats, which were relayed to his mother and did not target any specific person, were accompanied by an overt act to follow through with killing or hanging anyone. Therefore, the only issue is whether appellant's threats were made under circumstances that made actual future violence by appellant highly likely.
In this case, the evidence shows that appellant was delusional and that, as a result of those delusions, he had taken pictures of random people and vehicles containing people that he thought were monitoring him and threatened to "kill" or "hang" unidentified individuals that he believed were monitoring him. Appellant had had one violent episode with his girlfriend that reportedly occurred before his delusions began, but there was no evidence that he had been violent with anyone since his delusions began. Appellant also stated that he had been arrested for carrying a firearm at an unspecified time in the past[2] and had obtained access to an unloaded shotgun one night at his daughter's house with her permission about one month before his commitment. As explained below, those circumstances are insufficient to show that actual future violence by appellant because of his mental disorder is highly likely.
Initially, we address appellant's past act of domestic violence toward his girlfriend, which occurred six or seven years before the commitment hearing. That incident *235 occurred one or two years before appellant's delusions began, and nothing in the record suggests that the incident was in any way connected to his current threats or his mental disorder. It appears from this record to have been an isolated incident. Under those circumstances, that prior act of violence is too attenuated from appellant's mental disorder to be a predictor of his future dangerousness. See, e.g. , State v. S. D. M. , 198 Or. App. 153, 158, 107 P.3d 683 (2005) (evidence of a specific act of violence can establish a foundation for future dangerousness if "there is no indication that such violence is an isolated occurrence" (internal quotation marks omitted) ).
Likewise, to the extent that the trial court determined appellant was dangerous to others because of his threat to his mother that he would hang unidentified persons, that threat was insufficient under these circumstances. There was no evidence in the record that appellant had the means or even the physical capability to hang someone, or that the threat was anything more than the result of his delusions and agitation. Compare State v. K. L. , 220 Or. App. 647, 654, 188 P.3d 395 (2008) (the appellant's gestures and threats to kill her neighbor's children and put their heads on her fence were "ramblings" and "the product of appellant's agitated state," but not bona fide threats making future violence or harm highly likely), with State v. G. L. , 208 Or. App. 212, 217, 144 P.3d 967 (2006) (the appellant's detailed plan to murder his former wife under circumstances similar to his prior attempt to murder her was a bona fide threat).
The more concerning circumstances in this case are that appellant had taken pictures of random people and vehicles and identified the people in them as people who were monitoring him-people whom he also believed he needed to "kill" or "hang" to end the monitoring-and that he had in the past had access to firearms. Appellant taking photographs of random people, however, is not a circumstance that provides a sufficient basis for predicting appellant's future dangerousness. Perham testified that she had "grave concern for the safety of the community" because the photos indicated that appellant was associating random community members with his delusions. However, we have held that threats alone were not predictive of future *236 dangerousness even when the appellant made a targeted threat against a specific individual whom the appellant personally knew, which was not the circumstance *457 here. See State v. R. H. , 212 Or. App. 479, 482-83, 157 P.3d 1286 (2007) (no danger to others when the appellant repeatedly called the receptionist at his mother's care facility and threatened her by saying, "I'm going to get you" and also threatened to kill a police officer, telling the officer he was a "dead man walking"). Here, even though appellant's behavior in taking photos of strangers whom he believed were following him was socially uncomfortable or even disquieting, it is not a circumstance that made his actual future violence any more likely.
Finally, we address appellant's prior access to firearms, which include an unspecified prior arrest for carrying a firearm and his daughter placing an unloaded shotgun under his bed so that he could calm down and sleep. Although fact-matching in civil commitment cases is often "of little utility" because each case must be decided on its own facts, State v. J. K. , 177 Or. App. 373, 378, 34 P.3d 739 (2001), our case law illuminates how we have previously viewed cases where threats are made in conjunction with an appellant's access, or claimed access, to weapons. We have previously reversed the commitment of an appellant who gave a mental health worker the name of a person from whom he planned to get a gun with which he planned to "kill 500 people" because the appellant's threat and claimed access to a weapon were "passing and undeveloped." State v. B. P. , 229 Or. App. 487, 494, 211 P.3d 975 (2009). We have also reversed the commitment of a woman who made vague threats to kill various people and claimed that she had an arsenal of weapons stashed somewhere, because her threats were unaccompanied by any overt act to carry them out. State v. G. A. K. , 281 Or. App. 815, 821, 384 P.3d 555 (2016). We have also reversed the civil commitment of a man who had a delusional belief that he was a bounty hunter or security officer, and who went so far as to carry handcuffs, pepper spray, and a Maglite flashlight capable of being used as a weapon, but who did not use those items against anyone. State v. T. W. , 291 Or. App. 679, 689, 422 P.3d 305 (2018). Conversely, we affirmed the commitment of a woman who *237 fired a gun into the wall that divided her apartment from that of her neighbors because the act of firing the gun "clearly forms the foundation for a prediction of future dangerousness," and because the appellant continued to lack insight into the dangerousness of her behavior. State v. D. L. , 202 Or. App. 329, 335, 122 P.3d 97 (2005), rev. den. , 340 Or. 308, 132 P.3d 28 (2006) (internal quotation marks omitted).
Here, appellant had more than just claimed access to a weapon-he stated that he had previously been arrested for carrying a firearm and, one month before the hearing, had been given access to an unloaded shotgun. However, there is no evidence regarding the circumstances or timing of appellant's arrest for carrying a firearm. There is no evidence that appellant actually handled the shotgun or had ever used a weapon in the past. There is no evidence that, at the time of the hearing, appellant would have access to any firearm. Appellant never threatened to shoot anyone, and there is no evidence that he ever brought up obtaining a firearm after the night when his daughter placed an unloaded one under his bed. Because there is not a connection between appellant's prior access to firearms and his violent threats, and because there is no evidence that appellant had access to firearms at the time of the hearing, on this record, appellant's prior access to firearms is not a circumstance that shows that appellant was "highly likely" to engage in "actual future violence."
In sum, the record is not sufficient to show by clear and convincing evidence that appellant was a danger to others. The trial court erred in determining that appellant was a "person with mental illness," ORS 426.130(1)(a), who "because of a mental disorder" is "[d]angerous to * * * others," ORS 426.005(1)(f)(A). Accordingly, we reverse.
Reversed.

Only a "person with a mental illness" can be civilly committed. ORS 426.130(1)(a). Pertinent to this case,
" '[p]erson with mental illness' means a person who, because of a mental disorder, is one or more of the following:
"(A) Dangerous to self or others[ or]
"(B) Unable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future * * *."
ORS 426.005(1)(f).

As noted, there was no other evidence regarding the arrest.