No. 88 February 14, 2024 653

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of C. A. C.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

C. A. C.,
*Appellant.*

Marion County Circuit Court
21CC07313; A177831

Matthew L. Tracey, Judge pro tempore.

Submitted December 9, 2022.

Alexander C. Cambier and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Robert M. Wilsey, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

AOYAGI, P. J.

Reversed.

**AOYAGI, P. J.**

Appellant appeals a judgment of civil commitment. In January 2022, the trial court ordered that appellant be committed to the custody of the Oregon Health Authority for a period not to exceed 180 days, as well as prohibited from purchasing or possessing firearms, based on his being a "person with mental illness."[1] ORS 426.130(1)(a)(C). Specifically, he was found to be a danger to others as a result of a mental disorder. ORS 426.005(1)(f)(A). On appeal, appellant does not contest that he has a mental disorder. However, he argues that the evidence was insufficient to establish a resulting danger to others. We agree with appellant that the evidence was insufficient under ORS 426.005(1)(f)(A). Accordingly, we reverse.

### FACTS

Appellant has not requested *de novo* review, nor do we provide it.[2] We are therefore "bound by the trial court's findings of historical fact that are supported by any evidence in the record," and we "review the court's dispositional conclusions, predicated on those findings, for errors of law." *State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010). We state the facts accordingly. Because appellant does not contest that he has a mental disorder, we describe only the most pertinent evidence regarding his mental disorder and focus our fact summary on the evidence regarding dangerousness.

Appellant is a 31-year-old man. He was previously married to H, with whom he has a seven-year-old daughter, X. On December 28, 2021, appellant was placed on a physician's hold after being taken to a hospital emergency room for a wellness check. A civil commitment hearing was held on

---

[1] Because of collateral consequences, "an appeal from a civil commitment order does not become moot after the expiration of the commitment period." *State v. B. A. F.*, 290 Or App 1, 2, 414 P3d 486 (2018).

[2] *See* ORS 19.415(3)(b) ("Upon an appeal in an equitable action or proceeding other than an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record."); ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases.").

January 3, 2022. During the hearing, as found by the court, appellant was "respectful and quiet" and "stayed seated," although he seemed to be experiencing "some degree of pressure" insofar as the court noticed "sort of intense forms of eye contact and sort of nods."

The first witness was Dr. Wolf, appellant's attending physician on the hospital's psychiatric unit. Wolf opined that appellant has bipolar affective disorder and was suffering a manic episode. Appellant had been brought to the emergency room at 2:00 a.m. after calling the police to report his belief that his daughter had been sexually molested by someone. Appellant was agitated, grandiose, reported not sleeping well, and said his neighbors were listening through the walls and calling him a rapist. Appellant was in that state when Wolf first met him on December 29, but appellant had been "calm since then." Appellant had not taken any medications at the hospital, because he did not believe that he had a condition that required medication. Wolf noted that appellant reported very frequent marijuana use, and that marijuana can cause paranoia, which could explain some paranoia about neighbors, but marijuana does not cause mania. Regarding danger to others, appellant had "not been threatening" to anyone at the hospital or "inappropriate" with anyone on the unit. Appellant had "absolutely" not endorsed any homicidal ideations, had not threatened anyone in Wolf's presence, and had not said anything in Wolf's presence that caused Wolf concern for anyone's safety.

The next witness was H. H testified that she and appellant were married from 2013 to 2021. H is now engaged to someone else and sees appellant only when transferring X. When asked about past violence toward her, H testified that appellant was never physically violent and had never hit or "touched" her, but that he had blocked her from leaving areas or punched walls directly next her on an unspecified number of occasions. As for violence toward other people, H saw a physical altercation between appellant and a neighbor on a stairwell on October 16, 2021, but she did not see who started it. In the past, H has seen appellant yell and flip off people, without provocation, in parking lots or

driving by. On November 5, 2021, appellant told H that "it's only a matter of time before I murder you."[3]

On December 8, 2021, H had to pick up X at appellant's house after the police took appellant to the hospital. H saw that appellant's door was dented and covered in writing in red marker. X was lying in her underwear on a bed made on the floor. H did not see anything else. On December 30 (four days before the hearing), H filed for a restraining order, because of the threat on November 5 and the incident on December 28. H is afraid for herself, and she does not feel safe leaving X with appellant.

The next witness was the civil commitment investigator, de Obaldia, who met with appellant once, on December 29, 2021. He agreed with the bipolar diagnosis. When they met, appellant was "a bit disorganized in his thought process, tangential in his thinking," and had difficulty staying on topic. Regarding the incident on December 28, appellant told de Obaldia that he wiped X's bottom with sensitive baby wipes, "[i]t looked different," and he "didn't know what to do," so he called 9-1-1. When asked for his opinion whether appellant was a danger to others, de Obaldia stated that he believed appellant would be dangerous to X, based on reading the police report (which was not admitted into evidence) and talking to family members.

The civil commitment investigator's report (prepared by de Obaldia) was admitted into evidence in part.[4]

---

[3] There was also evidence that, in a phone call in October 2021, appellant told H that he was "worried" about her, because she "was dying" and "was going to die," so he was "worried" about her. There was no other evidence regarding that phone call. The state did not rely on that statement in its arguments to the trial court, the trial court does not appear to have relied on it, and the state does not rely on it on appeal.

[4] Appellant made very specific hearsay objections to the investigator's report. In ruling on those objections, the trial court clearly ruled that police statements to hospital staff recounted in the report would not be admitted for any purpose. The court's rulings on other challenged portions of the report are less clear, particularly as to which statements were admitted for the truth of the matter asserted, under the hearsay exception in OEC 803(4), and which would be considered only as information on which the investigator relied in forming his opinion on appellant's diagnosis. As to portions of the report for which the ruling is unclear, we include statements on which the state relies on appeal, because it is plausible that they were admitted for their truth and appellant does not contest the state's understanding that they were so admitted.

According to the report, appellant told hospital staff on December 28 that he "inspect[ed]" X's vagina "because it appeared to be in distress"; that he "looked at her vagina"; that he called the police because he "thinks without a doubt that [X] may have been sexually abused on December 26th" by her mother; that his home is bugged and people are calling him a rapist; and that he had not slept for more than 24 hours. The report also indicates that appellant repeatedly expressed concern about X to hospital staff on December 28. When de Obaldia interviewed appellant on December 29, appellant made paranoid statements about his neighbors bugging him, surveilling him, mimicking him when he walks to the bathroom, bullying him, and making "sexualized moans" when he cuddles X while they watch a movie, as well as describing what happened on December 28 in the manner to which de Obaldia testified.

Finally, appellant was examined on the record by the mental health examiner, Dalton. Appellant testified that he works full time as a computer systems analyst. He uses marijuana regularly and last used it on December 25, 2021. He disagrees that he is paranoid about his neighbors and, rather, feels "bullied" by the neighbors who live below him, as they use a broom on the ceiling and otherwise react to his every movement, even during the night, and listen closely to him in his home. After examining appellant, Dalton opined to the court that appellant has bipolar affective disorder, currently manic; that he is dangerous to X and H (without elaboration); and that he should take psychiatric medication, which will happen only if he is civilly committed, so he should be civilly committed.

Having heard all the evidence, the trial court called it a "very close case" but decided that the standard for civil commitment was met. The court found that appellant has bipolar disorder and, as a result, is a danger to others, specifically H and X. The court identified the evidence that it considered most relevant to the danger-to-others finding as (1) the threat against H on November 5, 2021, albeit an "older" statement; (2) appellant having inspected X's genitalia on December 28, 2021, based on a well-intentioned but

delusional belief that X had been sexually abused;[5] and (3) appellant's delusional belief that the neighbors were spying on him and making moaning sounds. Ultimately, after reiterating its finding that appellant had inspected X's genitalia on "a delusional basis," the court explained its danger-to-others finding:

> "Having not heard a sufficient factual record to suggest otherwise [the court] is concerned that there is a realistic nonspeculative probability in the near future that you will engage in some form of conduct towards either your daughter or your wife that will constitute some form of violence towards their person, their physical integrity.

> "And so notwithstanding your good intentions, because of the delusional contour of your bipolar manic disorder that you have not yet come to grips with, this Court is going to find that there is a sufficient basis under threat of danger to others to civilly commit you."

## ANALYSIS

ORS 426.130 allows for civil commitment of a "person with mental illness." A person with mental illness includes a person who, because of a mental disorder, is "dangerous to self or others." ORS 426.005(1)(f)(A); *see also State v. Miller*, 198 Or App 153, 161, 107 P3d 683 (2005) (a person may not be civilly committed based solely on having a mental disorder). The question here is whether the evidence was sufficient to support a determination that appellant is a danger to others. We review that question as a matter of law. *State v. C. L.*, 313 Or App 539, 542, 495 P3d 748 (2021).

To prove that a person is a danger to others, the state must establish by clear and convincing evidence "a factual foundation to predict appellant's future dangerousness based on his condition at the time of the hearing in the context of his history." *State v. M. G.*, 296 Or App 714, 718, 440 P3d 123 (2019) (internal quotation marks omitted). "[I]t

---

[5] During its extended oral ruling, the trial court referred to appellant having inspected X's genitals "on two separate occasions." No admitted evidence supports that finding, so we disregard it. *See B. B.*, 240 Or App at 77 ("[W]e are bound by the trial court's findings of historical fact that are supported by any evidence in the record[.]").

is appropriate for a court to consider the testimony of mental health experts, the person's past acts, and the person's apparent condition at the time of the hearing." *State v. Lott*, 202 Or App 329, 335, 122 P3d 97 (2005), *rev den*, 340 Or 308 (2006). "[A]ctual future violence" must be "highly likely." *State v. K. M.*, 314 Or App 586, 592, 496 P3d 1099 (2021) (internal quotation marks omitted); *see also State v. M. A.*, 276 Or App 624, 629, 371 P3d 495 (2016) ("Conclusions based on conjecture as to whether appellant poses a danger to others are insufficient." (Internal quotation marks omitted.)). "Although 'dangerous' is a common term that, in ordinary usage, may refer to a broad range of threats, the type of 'danger' necessary to justify an involuntary civil commitment is a narrow range of serious and highly probable threats of harm."[6] *State v. S. R. J.*, 281 Or App 741, 749, 386 P3d 99 (2016).

Appellant contends that the evidence admitted at his commitment hearing was legally insufficient to establish that, as a result of his bipolar disorder, appellant is a danger to others within the meaning of ORS 426.005(1)(f)(A). The state maintains that the evidence was sufficient. Like the parties, we understand the trial court to have found appellant to be a danger to H and X specifically, rather than a general danger to others, so we focus our discussion accordingly.

Appellant was married to H for eight years. At the time of the hearing, they were recently divorced, H was engaged to someone else, and H saw appellant only at child exchanges. There is evidence that appellant had been aggressive toward H at unspecified times in the past, but had never hit or otherwise "touched" her at such times. Against that backdrop, on November 5, 2021—approximately two

---

[6] In its answering brief, the state asserts that well-intentioned but misguided concerns about due process have led our court to stray too far from the ordinary meaning of "danger" and that the text, context, and legislative history of the civil commitment statutes support a less rigorous interpretation of "danger" than our case law employs. The state does not ask us to overrule existing precedent as to the meaning of "dangerous to self or others." Instead, it suggests that, if we deem this a "close case," we should rely on those considerations to tip us toward affirming. Given the analytical path that we take to our disposition, it is unnecessary in this case to engage in an intensive reevaluation of existing case law on the "dangerous to self or others" basis for civil commitment.

months before the commitment hearing—appellant said to H that "it's only a matter of time before I murder you." The record is silent as to the circumstances of that statement. The record is also silent as to any nexus between that threat (or other past conduct) and appellant's bipolar disorder.

It is well established that a person who makes a threatening statement cannot be civilly committed as a danger to others unless the threat is accompanied by overt acts or other circumstances that evince that the person is likely to commit actual violence in the future and unless the person's dangerousness is the result of a mental disorder. Appellant focuses on the first point, which is dispositive. *See, e.g., State v. J. P.*, 295 Or App 228, 234, 433 P3d 452 (2018) ("[T]hreats of violence must be accompanied by an overt act to follow through with the threat or be made under circumstances that make actual future violence highly likely." (Internal quotation marks omitted.)); *State v. E. D.*, 264 Or App 71, 74, 331 P3d 1032 (2014) (similar); *State v. D. L. W.*, 244 Or App 401, 405, 260 P3d 691 (2011) (recent threats combined with past overt violence is generally enough to establish a danger to others); *State v. K. S.*, 223 Or App 476, 486, 196 P3d 30 (2008) (finding the appellant to be a danger to others, where he had a history of violent behavior when off medication, had recently been involved in a physical confrontation, and had destroyed property at both his parents' home and the hospital); *State v. Bodell*, 120 Or App 548, 551, 853 P2d 841 (1993) (recent threats combined with past threats may establish a danger to others, if they provide ample evidence to predict future violence).

In other words, an empty threat that is not likely to be carried out, even if disturbing or distressing, is not a basis for involuntary civil commitment. *See, e.g., State v. E. J. J.*, 308 Or App 603, 614, 479 P3d 1073 (2021) ("mere verbal threats of violence made in the past are generally insufficient" to establish a danger to others (internal quotation marks omitted)); *State v. S. F.*, 291 Or App 261, 266, 420 P3d 691 (2018) (verbal threats "without some other evidence that the person would follow through with the threats, even if alarming, cannot establish a foundation for a finding of future dangerousness"); *State v. L. R.*, 283 Or App 618, 626,

391 P3d 880 (2017) (the evidence was insufficient for a danger-to-others finding where the appellant had "made threats of harm" but there was no evidence that he "had harmed anyone, attempted to harm anyone, or that any of his broad, vague threats would or could have been carried out"); *State v. G. A. K.*, 281 Or App 815, 821, 384 P3d 555 (2016) ("vague threats, in the absence of any overt act to carry them out," were insufficient to establish a danger to others).

In this case, appellant made a threatening statement to H two months before the commitment hearing, telling her that "it's only a matter of time before I murder you." Such a statement is obviously inherently alarming. There is no evidence of an accompanying overt act, however, or other circumstances evincing that appellant was likely to carry out that threat or otherwise act violently toward H absent commitment. The trial court expressed concern that appellant's delusional belief that H might be sexually abusing X could increase the risk of his being violent toward H, but that concern is impermissibly speculative on this record. There is no evidence that the threat against H in early November had anything to do with appellant's concerns about X in late December, and the only evidence of how appellant dealt with his concerns about X was his calling 9-1-1 on December 28. This record does not support the determination that appellant is dangerous to H as a result of his mental disorder within the meaning of the civil commitment statutes.

Whether the record is sufficient to establish that appellant is dangerous to X due to his mental order presents a more complicated question. As the trial court recognized, this case involves an unusual fact scenario for which there is no helpful precedent. It also raises complex questions about the types of "danger" the legislature intended to capture with the phrase "dangerous to self or others." Those questions have not been explored in existing case law—which focuses almost entirely on the risk of physical "violence" and physical injury—and the parties shy away from addressing them in a way directly connected to the facts of this case. Appellant focuses on existing case law regarding the need to prove that "actual future violence" and "physical harm" is highly likely and argues that standard is not met. In response, the state

leans away from existing case law—including case law recognizing that the "danger" necessary for civil commitment "is a narrow range of serious and highly probable threats of harm," rather than the "broad range of threats" to which "danger" may refer in ordinary usage, *S. R. J.*, 281 Or App at 749—and asserts that the ordinary meaning of "danger" is met. *See* 330 Or App at 659 n 6 (describing the state's view of existing case law).

Under the circumstances, we decide this case on the narrowest grounds possible, rather than unnecessarily addressing complex issues of statutory construction with far-reaching implications. We begin by addressing a threshold preservation issue raised by the state, then proceed to the merits, making certain assumptions *arguendo* for purposes of deciding whether the state proved that appellant is a "danger" to X within the meaning of ORS 426.005(1)(f)(A).

With respect to preservation, the state argues that, although appellant generally preserved his claim that the evidence was legally insufficient to establish a danger to others within the meaning of ORS 426.005(1)(f)(A), he did not preserve any argument that a danger of "potential psychological harm" would not meet the statutory standard, and that we should therefore "not address" that argument. We agree that we should not address whether the state can meet the standard for involuntary civil commitment by proving that a person poses a danger of "psychological harm" to others, but for a different reason—because that issue was neither argued nor decided in the trial court, and, even on appeal, the parties' positions on it are unclear.

In the trial court, the parties' arguments focused more on H, and, as to X, no one mentioned or even alluded to psychological harm as a consideration. There also was no evidence offered on that issue. Appellant generally argued that he could not be committed unless the state proved that it was highly likely that he would "commit an act of actual violence in the future," the state did not dispute that that was the applicable standard,[7] and the trial court ruled

---

[7] The parties agreed on the legal standard for commitment but disagreed on whether it was met and, as mentioned, made more detailed arguments about H than X, perhaps because the live testimony was more focused on H.

under that standard, finding a danger to others based on a near-term risk of appellant engaging in "some form of violence towards [X's or H's] person, their physical integrity." On appeal, appellant makes one reference to "potential psychological harm" in his brief, noting the lack of any case law on that issue. In response, the state discusses psychological harm only in its preservation section, as previously described. In arguing the merits, the state does not mention psychological harm, and it is unclear whether the state is implicitly relying on a danger of psychological harm as relevant to the sufficiency of the evidence for civil commitment.

Under the circumstances, this is not the appropriate case to decide whether a "danger to self or others" in ORS 426.005(1)(f)(A) encompasses a danger of psychological harm, and we do not decide that issue. We do, however, make certain assumptions, in aid of narrowing the issue that we decide today. First, we assume *arguendo* that a person who is likely to commit child sexual abuse as a result of a mental disorder is a danger to others under ORS 426.005(1)(f)(A). Second, more generally, we assume *arguendo* that a person who is likely to commit a person crime against a child or adult, as a result of a mental disorder, is a danger to others under ORS 426.005(1)(f)(A). *See generally* ORS chapter 163 (setting forth offenses against persons).

With those assumptions in place, we consider whether the hearing evidence was legally sufficient to establish that appellant is highly likely to physically harm X due to his mental disorder, which was the issue presented to and decided by the trial court.

On December 28, 2021, appellant "inspected" or "looked at" his seven-year-old daughter's vagina, possibly in connection with wiping her bottom with a diaper wipe, and called 9-1-1 to report possible sexual abuse. The evidentiary record is silent as to any details of what occurred beyond those basic facts. The trial court found, and the evidence supports, that appellant's conduct was the result of a delusional belief that X had been sexually abused. That is, appellant was not sexually motivated and therefore, by definition, did not sexually abuse X. *See* ORS 163.305(5) (defining "sexual contact," as used in the sexual-abuse statutes

and other criminal statutes, to mean any touching of sexual or intimate parts "for the purpose of arousing or gratifying the sexual desire of either party"). There also is no evidence that appellant committed any other crime against X, such as unlawful sexual penetration—which may be committed even without "sexual or injurious intent," *State v. Gilbreath*, 310 Or App 724, 728, 489 P3d 144, *rev den*, 368 Or 637 (2021)—or criminal mistreatment, ORS 163.205(1), which includes intentionally or knowingly causing physical injury to a dependent person.

Appellant argues that a single instance of his "looking at his own daughter's vagina to see if [she] had been harmed and then immediately calling 9-1-1 to report the potential abuse does not provide a sufficient basis to predict a high likelihood of actual future violence by the appellant." On this record, we agree that the record is legally insufficient to meet the statutory standard. The record is exceedingly thin as to what actually occurred on December 28. Moreover, the trial court specifically found that appellant acted out of a delusional belief that his daughter had been sexually abused, and that finding is binding on appeal because it is supported by the record. Ultimately, the existing record does not support the trial court's finding of a high likelihood of "violence towards [X's] person, [her] physical integrity."

Accordingly, on this record, the trial court erred in civilly committing appellant on the basis that he is a danger to others as a result of his bipolar disorder. We again emphasize the very narrow issue that we decide in this case and, conversely, the issues that we do *not* decide, including whether "danger to self or others" in ORS 426.005(1)(f)(A) encompasses psychological harm. We also emphasize that the only issue before us is the sufficiency of the evidence for involuntary civil commitment and that other proceedings—such as custody modification proceedings and juvenile dependency proceedings—are subject to entirely different legal standards.

Reversed.