270 P.3d 324 (2011)
247 Or. App. 394
In the Matter of L.D., Alleged to be a Mentally Ill Person.
STATE of Oregon, Respondent,
v.
L.D., Appellant.
M090132; A143899.
Court of Appeals of Oregon.
Argued and Submitted March 31, 2011.
Decided December 29, 2011.
Thomas A. Coleman, Portland, argued the cause and filed the brief for appellant.
Ryan Mack, Certified Law Student, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Kristen G. Williams, Assistant Attorney General.
Before HASELTON, Presiding Judge, and ARMSTRONG, Judge, and DUNCAN, Judge.
ARMSTRONG, J.
Appellant seeks reversal of an order committing him to the custody of the Mental Health Division based on a finding that, because of a mental disorder, appellant was dangerous to himself and to others. ORS 426.005(1)(e)(A); ORS 426.130(1)(b)(C). Appellant contends that the state failed to establish by clear and convincing evidence that he presented a danger to himself or to others. We agree and, accordingly, reverse.
*325 Although appellant has asked us to exercise our discretion under ORS 19.415(3)(b) to review this case de novo, he did not provide any justification for doing so, and, based on the strong presumption against our use of de novo review, ORAP 5.40(8)(c), we decline to review the facts in this case under that standard. Accordingly, we defer to the trial court's findings of fact if there is any evidence in the record to support them and review the court's legal conclusions for legal error. State v. B. B., 240 Or.App. 75, 77, 245 P.3d 697 (2010). The court did not make any express findings, but it did decide by clear and convincing evidence that appellant was a danger to himself and to others. Accordingly, we state the facts in the light most favorable to the state to determine if they are legally sufficient to support the court's decision. State v. J.D. S., 242 Or.App. 445, 448, 263 P.3d 1017 (2011).
Appellant suffers from bipolar disorder and had been involuntarily committed for treatment five times between January 1997 and December 2002. The events that led to his latest commitment in 2009the subject of this casebegan about six months before his commitment hearing when police officers brought appellant to an emergency room for evaluation due to his insistent statements to the officers that he wanted to make them shoot him. Eckart, a certified mental health investigator, interviewed appellant for that evaluation and released him shortly thereafter.[1] Four months later, appellant pushed his son while appellant was returning a lawn mower that he had borrowed. Appellant's son apparently perceived that incident as the culmination of threats that appellant had made in telephone conversations that he had had with family members, but appellant's son did not report the incident to the police.
About two weeks before the commitment hearing, appellantout of a desire to impede activities occurring at Oregon State Universitydrove five miles per hour in traffic heading toward an Oregon State University football game, which resulted in him being banned from university property. A few days after that incident, police arrested appellant for criminal trespass at a business in Corvallis, and Eckart again evaluated him at the Benton County Correctional Facility. During a series of evaluations, appellant told Eckart that he would not comply with voluntary treatment and that he wanted to be released so that he could obstruct traffic at the next Oregon State football game. As a consequence of those evaluations, appellant was recommended for civil commitment, and the state initiated a commitment proceeding against him.
At the commitment hearing, appellant's psychiatrist, Dr. Erickson, opined that appellant, although not engaging in "intentionally suicidal or homicidal" behavior, was a danger to himself and others because his ability to assess and interpret other people's reactions to his provocative behavior was impaired to the point that there was "a very high risk of physical fights or assault that maybe someone else will initiate."[2] Erickson based his opinion on appellant's history and events that occurred during appellant's prehearing detention, viz., appellant had called a female patient a "fat idiot," which led the patient to toss ice water on him, and he had engaged in "loud, threatening, and posturing behaviors" with some male patients and staff, which led to "close calls" of physical conflicts between the patients and appellant.
Consistently with Erickson's opinion, Eckart testified at the hearing that although he was not aware of appellant engaging in overtly violent conduct or conduct resulting in appellant harming himselfappellant was a danger to himself because he was "likely to put himself in situations such as inciting fights or arguments with people [who] probably are going to hurt him" and appellant was a danger to others because he intended to continue his earlier behavior of impeding traffic. However, Eckart also testified that his biggest concerns regarding appellant *326 were that appellant had recently lost his housing and refused to take his medication or otherwise engage in treatment. Because of those concerns, Eckart implored the court to commit appellant because of his inability to care for his basic needs.
At the end of the hearing, the trial court ordered appellant's commitment to the custody of the Mental Health Division for a period not to exceed 180 days, concluding that he
"is mentally ill based upon clear and convincing evidence, that he is not willing to participate in treatment on a voluntary basis based upon * * * clear and convincing evidence, [that he] is dangerous to himself and others by clear and convincing evidence, and [that] he meets the criterion under [ORS] 426.005."
On appeal, appellant contends that the state did not present clear and convincing evidence that he had a mental disorder that made him a danger to himself or to othersa burden imposed under ORS 426.005(1)(e)(A) and ORS 426.130(1)(b)because the testimony at the commitment hearing lacked sufficient specificity. In response, the state argues that appellant engaged in behaviors that would provoke others to assault him, and, because of the high likelihood that he would continue to behave in that fashion, the court correctly concluded that he was a danger to himself.[3] For the reasons that follow, we agree with appellant that the state did not prove by clear and convincing evidence that he was a danger to himself or to others, and we take up the alleged grounds for commitment in that order.
To prove that appellant is dangerous to himself, the state must show that appellant's mental disorder will cause him to behave in a way that is likely to result in actual serious physical harm to himself in the near future. B. B., 240 Or.App. at 82, 245 P.3d 697. Further, the required expectation of actual serious physical harm must be established by more than mere speculation or conjecture. State v. F. C., 239 Or.App. 83, 86, 243 P.3d 144 (2010); see also State v. Ayala, 164 Or.App. 399, 404, 991 P.2d 1100 (1999) ("Apprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment.").
Here, the state sought to prove that appellant was a danger to himself on the theory that his aggressive behavior toward others would result in physical harm to himself when the people who were the subject of his aggression retaliated against him. Although the witnesses at the commitment hearing offered opinions that were consistent with that theory, those conclusions must be supported by facts. See State v. Allen, 209 Or.App. 647, 653, 149 P.3d 289 (2006) ("The bare conclusion of an examiner, however, is not adequate to support commitment; an examiner's conclusion must be supported by facts."). The evidence in this case that could provide that support is the testimony that appellant had postured with male patients and staff; had insulted a female patient, resulting in the patient throwing ice water on him; and had told police officers six months before the commitment hearing that he wanted to make them shoot him.
However, that evidenceeven viewed in the light most favorable to the statedoes not support the witnesses' conclusions. Appellant's encounters with other patients and staff during his prehearing detention, although certainly the consequence of obnoxious behavior on appellant's part, do not support a finding that he would be seriously physically harmed by other people in the near future as a result of engaging in similar behavior; the record shows only that he was, at most, at risk of some type of retaliation that was far from serious, such as having ice water thrown on him. See State v. Judd, 206 Or.App. 146, 154, 135 P.3d 397 (2006) (concluding that the appellant was not a danger to himself because, although "[t]here is evidence that [the] appellant can become aggressive, * * * nothing indicates that his aggression rises to a level that is likely to provoke a violent response"). Further, because appellant's initial encounter with the *327 police was six months old and the evidence about his subsequent police encounters lacked specific details, the remainder of the record in this case is legally insufficient to prove that appellant's behavior was highly likely to result in actual serious physical injury to appellant in the near future.
To prove that appellant was a danger to others, the state generally must offer more than evidence of appellant's threats of future violence, such as a corresponding overt act demonstrating an intention to carry out the threats or other circumstances indicating that actual future violence is highly likely. State v. B. P., 229 Or.App. 487, 493, 211 P.3d 975 (2009). Here, the evidence pertaining to whether appellant was a danger to others includes threats that appellant made to his family members on the telephone; the incident during which appellant pushed his son when returning a lawn mower; and the incidents during which appellant attempted to obstruct traffic by driving slowly.
Similarly to the evidence regarding appellant's dangerousness to himself, the evidence in the record is legally insufficient to support the court's conclusion that appellant was a danger to others. Although appellant's son testified about his belief that appellant's push was the product of the threats that appellant had made to him and other family members, considering the severity of the threats that appellant's son and other family members had receivede.g., that appellant was going to "destroy" themand the lack of additional details about the motivation for the push, that incident was so disproportionate to the threatened future violence that it cannot demonstrate appellant's intention to carry out his threats. Also, appellant's attempts to obstruct traffic, although admittedly ill-advised and potentially dangerous as a general matter, are insufficient to establish that appellant will engage in some future conduct that will physically harm others; rather, his threats to impede traffic suggest a result consistent with that which occurred when he attempted to impede traffic earlierviz., mere inconvenience for other drivers. Therefore, the state did not present clear and convincing evidence that appellant was a danger to others.
In sum, the record in this case, even when viewed in the light most favorable to the state, is legally insufficient to support the court's conclusion that appellant's mental disorder would cause him to be a danger to himself or to others, and, accordingly, the court erred in ordering appellant's involuntary commitment.
Reversed.
NOTES
[1] Since that initial evaluation, Eckart has received about 10 police reports of incidents involving appellant, but the record does not disclose any specific details about the nature or content of those reports.
[2] Appellant's mental health examiner, Neve, also testified at the hearing that appellant was dangerous to himself and to others because "his behaviors both agitate others and contribute to the danger of retaliation from others."
[3] The state does not respond to appellant's argument regarding the insufficiency of the evidence to establish that appellant was a danger to others. However, because the court's determination that appellant was a danger to others could independently justify the court's decision to commit him, we must also decide whether the state proved that ground for commitment.