Submitted August 26, 2015, reversed February 8, 2017

In the Matter of L. R.,
a Person Alleged to have a Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

L. R,
*Appellant.*

Multnomah County Circuit Court
140362820; A156780

391 P3d 880

Garrett A. Richardson and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Matthew J. Lysne, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Egan, Judge.

**EGAN, J.**

Appellant seeks reversal of a judgment that ordered his involuntary commitment to the Oregon Health Authority for a period not to exceed 180 days, under ORS 426.130(1)(a)(C). Appellant contends that the record does not establish by clear and convincing evidence that he was a danger to others because of a mental disorder. *See* ORS 426.130; *former* ORS 426.005(1)(e)(A) (2013), *renumbered as* ORS 426.005(1)(f)(A) (2015).[1] We agree that the evidence in the record is not legally sufficient to conclude that appellant was a danger to others. Accordingly, we reverse.

When reviewing a challenge to a civil commitment judgment, unless we exercise our discretion to review the matter *de novo,* "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. R. L. W.,* 267 Or App 725, 728, 341 P3d 845 (2014) (internal quotation marks omitted). Neither party has asked us to review the matter *de novo,* and we decline to do so. *See* ORAP 5.40(8)(c) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases").

Before the events at issue here, appellant, a 24-year-old African-American man, had showed no signs of having a mental disorder. Shortly before these events, appellant's relationship with his girlfriend, with whom he had been living, had ended, and he had lost his job at Portland International Airport. On March 12, 2014, Officer Ko, on duty at the airport, was doing routine rounds of the terminal and found appellant and another man yelling at each other. Appellant was standing behind a Sky Cap podium yelling and swearing at the other man, an unknown traveler, who was backing away from appellant. Appellant did not pursue the man but instead took his own personal possessions and threw them onto the podium. Ko could not understand what appellant

---

[1] Only the numbering is different; the wording is the same in both. In the remainder of this opinion, we will refer to the statute in effect at the time of the hearing, ORS 426.005(1)(e)(A) (2013).

was yelling about, but he did recall appellant claiming that he was a gang member and threatening that "he was gonna have us all killed" by the gang.

While facing Ko, appellant took off his jacket and shirt, "clench[ed] his fists and drop[ped] his arms in front of him and just kind of flex[ed] * * * and tense[d] up his muscles." Another officer arrived and appellant walked away from his belongings and Ko. Appellant flexed his muscles at the other officer, and that officer drew his Taser and ordered appellant to the ground. Appellant complied and was arrested for disorderly conduct.

Appellant was calm after he was arrested. He was issued a 90-day exclusion from the airport and taken to jail. Hours later, after appellant was released, he returned to the airport, where he was arrested for trespassing. In jail, appellant was evaluated by mental health staff and transported to Emanuel Hospital where he was further evaluated and given medication for schizophrenia and bipolar disorder.

On March 13, the investigator who would later write the precommitment investigation report met with appellant at the hospital. According to that report, appellant took his medication while at the hospital and was compliant with the staff directions even when he became upset. Although appellant demanded to be released, he did not threaten the staff and stated that he had no intentions of harming anyone. When he was released, he stayed with his older cousin, whom he had always called his aunt. He later confirmed that he had begun taking the medication that he had received from the hospital but had stopped taking it because it made him tired and unable to function properly.

Two weeks later, appellant was again detained in a hospital, where he remained until the involuntary commitment hearing. The record does not explain how or why appellant was taken to the hospital, but on that day he had been walking through a neighborhood, knocking on strangers' doors. Appellant later said that he had done that because he did not feel like he had a home and was trying "to go back to [his] roots" and visit the places where he had lived and the people who used to live in the neighborhood.

On March 31, the precommitment investigator met with appellant in the hospital. Before their meeting, the investigator heard appellant yell that he was not an animal to be caged and he should not be locked up like a prisoner. Appellant told the investigator that he was sad and that when he is sad he gets mad and, in his words, "I punch out windows or have a temper tantrum." Appellant asked the investigator to discharge him from the hospital so that he could see his family. When he was told that the investigator could not bring about his release that day, appellant walked away from the investigator while yelling obscenities and demanding to be let out of the hospital.

Less than an hour after the investigator's interview with appellant, she observed via video monitor that appellant was pacing rapidly, yelling, and demanding to be discharged. According to the investigator, appellant was yelling,

> "[o]pen the door and no one has to get hurt. * * * I'm going to blow up little kids. * * * I'm a terrorist. I will break another fucking [television] remote. * * * Let me the fuck out of here. * * * I will have you gang raped * * *. The police work for me. I have all the money in the world in my name. I'll get all your family members killed."

Appellant continued to yell and demand to be released while he repeatedly hit and kicked a locked door. He threw the television remote control against the door several times and unsuccessfully tried to pick up a table that was bolted to the floor. Appellant then broke a toilet seat in half and used half of it to beat on the shatter-proof cover of the common area television and on the door while he continued to yell, threatening to kill people unless he was let out. He retrieved the other half of the toilet seat and beat on the shatter-proof cover of a security camera. At that point, from behind a door, a staff member requested that appellant return to his room, and appellant complied. Appellant then left the two pieces of the toilet seat in his room when he returned to the common area.

Twelve to fifteen staff members—including nurses, mental health therapists, and three security officers—then entered the common area and slowly approached appellant,

led by two security officers with shields and helmets. Appellant continued to demand to be released as he backed into a corner. Staff attempted to calm appellant, but he would not reason with them or take the medications that they offered to him. He yelled that he "owns the police" and that the staff had no right to keep him "locked up." Appellant threatened to kill or have others kill all of the staff. Appellant yelled that he would fight all of them, took off his shirt and one of two pairs of pants that he was wearing, pounded his chest, and got into a fighting stance. The staff approached appellant, pinned him between the corner of the room and the shields, pulled him to the floor, and injected him with medication while he struggled and demanded release. They put appellant in wrist and ankle restraints, reassured him that they did not want him to be hurt, and he agreed to walk with staff to a secure room instead of being taken on a stretcher. While complying, appellant continued to demand his release and threatened to have his gang kill everyone.

On April 3, 2014, an involuntary civil commitment hearing was held at the hospital where appellant was detained. During the hearing, appellant told the trial court that he had recently been fired from his job at the airport and was having trouble getting another one because of his race. He said that he was sad about his recent breakup and had been staying with family members. Appellant stated that he was not liked and was racially discriminated against in Oregon. He told the trial court that he did not think he had any mental health issues, but appellant also agreed that he would take medication if he had to do so as long as it did not make him too tired to function.

During the hearing, Ko was asked if he had been concerned about the potential for violence between appellant and the traveler or between appellant and the arresting officers at the airport. He responded, "I thought there could be a potential for violence. I wasn't expecting it. * * * [B]ut in his state, I wasn't sure. I mean, he was just kind of out of control."

Appellant's cousin, with whom he had been staying in the weeks before he was detained at the hospital, testified that she had known appellant his whole life and he had never

had trouble with violence or aggressive behavior. She stated that she was not concerned about him hurting her. She also testified that, while appellant had not shown signs of mental illness in the past, during the time he stayed with her, appellant had acknowledged privately that he was concerned that he might be facing some mental health issues. Appellant's cousin told the court that appellant could continue to live with her temporarily, provided that he was taking medication. She testified that appellant had told her that he had acted in a threatening manner in the hospital because he was taunted and treated differently because of his race.

Certified examiners Dr. O'Malia and Mohler attended the hearing and questioned appellant and the other witnesses. O'Malia told the court that she believed that appellant's "impulsivity, his volatility, and his delusions would just be a dangerous combination" in the community. In describing her concerns that led her to recommend commitment, O'Malia said, "And he's frightened people. He's threatened people. And he's really not aware of how inappropriate his actions are."[2] O'Malia stated, "I mean I just feel that his potential for violence is high. But I think his potential to menace and threaten is absolutely proven." She then concluded her testimony by saying that she did not believe that appellant was willing to take medication.

Mohler testified that he was concerned about the incident at the airport, but he believed that by complying with the officer's orders, appellant showed the judgment to avoid harm. He noted that, although appellant had been aggressive and had attempted to destroy property while in the hospital, it was "not untypical" for people in psychiatric facilities to be uncooperative with treatment, misunderstand staff intentions, or act out in dangerous ways.

Mohler expressed concern about involuntarily committing appellant, because he had never harmed anyone in

---

[2] O'Malia continued this line of thought in her report:

"As he is a large young man, [6'2", 175 lbs.,] his threats and menacing behaviors are frightening to people, and his judgment is so compromised that his actions are unrealistic (going to strangers['] doors). He is at high risk of escalating if discharged, and continuing threatening behaviors, which may well escalate into violence."

the community and had no history of the behavior he showed in the hospital. Additionally, Mohler noted that appellant's family was not afraid of him. Unlike O'Malia, Mohler believed that appellant had shown that he was interested in continuing treatment if it was recommended. Mohler concluded that at that time there was no evidence that appellant was a danger to others.

After Mohler had made his recommendation, appellant's counsel asked O'Malia to explain to the court the nexus between appellant's mental disorder and his dangerousness to others. O'Malia responded that appellant had a new, delusional "sense of being racially discriminated against." According to O'Malia, appellant blamed discrimination for the bad things that had happened to him, like getting fired or having trouble finding a new job, and reacted with anger. She added that appellant's inability to accurately perceive what was happening to him caused him to be confused and react with poor judgment and agitation.

The trial court began its explanation of its ruling by stating that it wished it had more information and found the case to be "troubling." The trial court was most concerned about appellant's behavior in the hospital a few days before the hearing. The court found that appellant's aggressive behavior was new, out of character, and a response to appellant's inability to understand what was going on around him. The trial court also expressed concern that appellant's "posture" and his "threatening and poor, impulsive judgment in his behaviors towards the police officers" at the airport could have led to him being tased. The trial court then concluded that appellant suffered from a mental disorder and that appellant was a danger to others because of that disorder.

On appeal, appellant does not challenge the trial court's determination that he has a mental disorder, but he argues that the state did not present sufficient evidence that he was a danger to others. He argues that he had never harmed anyone and any conclusion that he posed a real risk of danger to others was speculative. The state responds that the evidence presented about the airport and hospital incidents are enough for a rational factfinder to conclude that appellant was a danger to others.

A court may commit a person for involuntary mental health treatment for up to 180 days if the state proves by clear and convincing evidence that the individual is "a person with mental illness." ORS 426.130(1)(a)(C). As relevant here, a "person with mental illness" includes a "person who, because of a mental disorder, is * * * [d]angerous to * * * others." ORS 426.005(1)(e)(A) (2013). "Whether a person is a danger to others is determined by [his] condition at the time of the hearing as understood in the context of [his] history." *State v. D. L. W.*, 244 Or App 401, 405, 260 P3d 691 (2011) (internal quotation marks omitted). "[T]he type of 'danger' necessary to justify an involuntary civil commitment is a narrow range of serious and highly probable threats of harm." *State v. S. R. J.*, 281 Or App 741, 749, 386 P3d 99 (2016).

To establish that a person is dangerous to others, the state must establish that "actual future violence is highly likely." *State v. L. D.*, 247 Or App 394, 400, 270 P3d 324 (2011). Although specific acts of violence are not required to establish dangerousness, "[p]ast acts, including verbal acts, can justify a finding of dangerousness, so long as the acts clearly form a foundation for predicting future dangerousness." *State v. M. A.*, 276 Or App 624, 629, 371 P3d 495 (2016) (internal quotation marks omitted). Even evidence of past violent acts must provide a foundation to predict future dangerousness, not merely describe past isolated incidents. *State v. A. M. R.*, 236 Or App 186, 191, 235 P3d 720 (2010). For the state to prove that actual future violence by the appellant is highly likely, it will generally have to provide evidence that shows that the appellant's threats of future violence are accompanied by an overt act demonstrating an intention and ability to carry out the threats or other circumstances indicating that actual future violence is highly likely. *State v. E. D.*, 264 Or App 71, 74, 331 P3d 1032 (2014). "'Conclusions based on conjecture as to whether appellant poses a danger to others are insufficient.'" *M. A.*, 276 Or App at 629 (quoting *State v. Woolridge*, 101 Or App 390, 394, 790 P2d 1192, *modified on recons*, 102 Or App 559, 794 P2d 1258 (1990)). We impose those rigorous standards because of "the serious deprivation of liberty and social stigma that are attendant to a civil commitment, and the fact that such

a preventive confinement is predicated on a prediction of future behavior." *State v. D. R.*, 239 Or App 576, 582-83, 244 P3d 916 (2010).

In this case, the state failed to present legally sufficient evidence that appellant posed a nonspeculative danger to others. Although he made threats of harm, no evidence was presented that appellant had harmed anyone, had attempted to harm anyone, or that any of his broad, vague threats would or could have been carried out. Accordingly, the threats are insufficient alone to conclude that appellant would become violent towards others and that he thus posed a highly likely risk to harm anyone in the future.

The trial court stated that the evidence showed that appellant had engaged in out-of-character "aggressive behavior" starting from the time of the incident at the airport. The court added that the behavior seemed to stem from appellant's inability to understand what was going on around him and caused him to act in "ways that are dangerous." But, when it described the acts that illustrated its conclusions that appellant was dangerous, the trial court noted that appellant's threatening "posture and behavior" and poor judgment in his interactions with police at the airport could have gotten him tased. The trial court later discussed its concern that, if appellant continued to aggressively yell and posture, he would cause others to start a violent physical interaction. Although "[e]vidence that a person is likely to engage in actions that will provoke an assaultive response may be enough to support a civil commitment on the theory that the person is a danger to himself," *M. A.*, 276 Or App at 629, the trial court did not conclude that appellant was a danger to himself. It concluded that he was a danger to others, and that conclusion is not supported by those facts.

Moreover, the record shows that appellant was not a physical threat to the traveler or to the police at the airport. He yelled at the traveler from a distance and broadly threatened to have everyone killed. Appellant took no action beyond muscle flexing and posturing. The responding officer at the airport did not expect appellant to become violent, but was not sure because appellant was "kind of out of control." At the hearing Mohler testified that appellant, even in his

agitated state, showed that he knew when to comply with the police to avoid actual physical harm.

The trial court concluded that appellant's behavior in the hospital a few days before the hearing "was really extraordinary in its dangerousness to others." That incident began and was based upon appellant demanding to be let out of the hospital. The record shows that appellant yelled to be released, broke things, and seemed out of control, but then he complied with a request to return to his room. When he was faced with a group of security and medical personnel, appellant only yelled, made empty threats, and postured. After the staff had advanced on him, he agreed to comply with their request to go with them voluntarily. Once again, even in a highly agitated state when appellant seemed to be completely out of control, he complied with requests. There is no evidence that he ever struck out at anyone or attempted to harm anyone at the hospital. Additionally, we have previously expressed doubt that a person's acts towards mental health workers are necessarily predictive of the person's conduct outside of those circumstances. *See S. R. J.*, 281 Or App at 755 n 5 (noting "a certain irony to involuntarily hospitalizing a person because that person engages in threatening behavior when involuntarily hospitalized"). And in this case, appellant's behavior at the hospital appears to be related to his demands for release from the hospital. Accordingly, appellant's actions in that incident are of less value as a predictor of danger to others in the community than they might be otherwise.

During the hearing, the trial court and one of the examiners appear to have focused on the fact that appellant could intimidate and scare others. But a person cannot be involuntarily committed because the person is likely to scare people when they yell and threaten; that is not a basis to conclude that a person is a danger to others. The state must prove that the person is a danger to others because he or she is highly likely to actually become violent towards people in the future. Appellant's ability to frighten people is not a basis for a conclusion that he is a danger to others.

In addition, the fact that appellant could get agitated, be aggressive, or have the bad judgment to act in ways

that make people uncomfortable is not enough to determine that he is a danger to others. *See S. R. J.*, 281 Or App at 755 (citing *State v. B. P.*, 229 Or App 487, 493, 211 P3d 975 (2009) (stating that evidence that a person is "agitated and aggressive is not sufficient evidence" to establish that the person is dangerous to others)).

In total, the evidence in the record on which the trial court relied to conclude that appellant was a danger to others consists of appellant yelling, making broad threats, posturing menacingly at people, feeling persecuted because of his race, possessing "poor judgment," and destroying objects. Neither of the examiners made a link between appellant's past conduct and how that would result in a high probability of violence toward people in the future. The evidence also showed that, even at the times when appellant appeared to be most out of control at the airport and in the hospital, he complied with orders or requests to modify his behavior. The law does not allow for people to be involuntarily committed out of an abundance of caution because a person's actions are unpredictable or make people uncomfortable; instead, a person's actions must demonstrate that the person is highly likely to harm others.

In this case, appellant's actions and past history do not establish a basis from which the trial court could conclude that appellant posed a nonspeculative danger of harming others.

Reversed.