AOYAGI, J.
*715 Appellant seeks reversal of an order continuing his commitment to the Oregon Health Authority for a period not to exceed *125 180 days, based on his being a person with mental illness and needing further treatment. In his single assignment of error, appellant contends that there was insufficient evidence to support the order. We agree and, accordingly, reverse.
Unless we exercise our discretion to review de novo , which we do not in this case, we view the evidence and permissible inferences therefrom in the light most favorable to the trial court's disposition to determine whether the record, so viewed, was legally sufficient to permit the court's decision. State v. L. R. , 283 Or. App. 618, 619, 391 P.3d 880 (2017). We state the facts in accordance with that standard. All of the facts come from the testimony of Dr. Read, appellant's attending psychiatrist at the Oregon State Hospital (OSH), who testified at appellant's recommitment hearing.
Appellant is a 51-year-old man with a longstanding diagnosis of schizoaffective disorder. He also has a cognitive disorder and hearing loss due to a childhood accident. Appellant has limited insight into his mental health condition. He does not believe his diagnosis, but, at the same time, "when he's doing better, he recognizes that he's okay on the medication."
Appellant did very well from 2004 to 2015, while living in a facility called Alberta Place, which provided medication reminders and "a lot of support." In 2015, appellant was "stepped down" to Harriot Court, a less structured environment in which appellant had to ask for his own medications and was not given reminders. He did not do as well there. Sometime around August 2016, appellant left Harriot Court. According to Read, it is unknown where appellant was living from August 2016 to May 2017.
In May 2017, the police found appellant in a public park. He was carrying a fake gun and did not obey orders. Believing that the gun was real, the officers shot at him. Appellant was not hurt, except that a bullet grazed his ear. Three days later, appellant tried to break into his family *716 home, in which his mother and brother live, and which he has a delusional belief that he owns. Shortly thereafter, appellant, who was off his medications, was civilly committed as dangerous to self and others.[1]
Appellant was held briefly at Unity Hospital. At Unity, he "was saying that he was a police officer and would point his finger at people and pretend to shoot." He also made calls to the Federal Bureau of Investigation (FBI) and the Central Intelligence Agency (CIA) regarding "his concerns about protecting others"; over the years, appellant has often had delusions about the FBI and the CIA and has had "a lot of contacts with upper government agencies regarding his concerns around protecting others, but also around some threats that he's made."
Appellant was transferred to OSH after a short time at Unity. Appellant showed a "great deal of improvement" at OSH. He took his medications consistently and was moved up in terms of privileges. He was "very pleasant most of the time" and "[did] relatively well." He did not make any threats against anyone while at OSH. Appellant improved "a great deal" from June to November, particularly in October and November.
Nonetheless, the Oregon Health Authority sought to continue appellant's commitment, pursuant to ORS 426.301, due to concerns that appellant would discontinue his medications if released to an unsupervised setting. As Read explained at appellant's hearing in November 2017, "the dilemma" was that appellant was doing well and would continue to do well as long as he stayed on his medications, but he needed to live somewhere like Alberta Place that would give him medication reminders, and the state had been unable to find him that kind of placement before his commitment expired. The possibility of appellant voluntarily *717 extending his commitment *126 for 60 days had been discussed with him, but he wanted a hearing, so recommitment was the only way to ensure that he stayed on his medications until an appropriate placement was located.
At the conclusion of the recommitment hearing, the trial court ordered the continuation of appellant's commitment for up to 180 more days, based on a finding that appellant was dangerous to others. Specifically, the court found that appellant has a mental disorder, that he would not be able to maintain his medications if released into an unsupervised environment, and that, without medication, he would "become dangerous due to his delusional thinking." Appellant appeals the order of continued commitment.
An involuntary civil commitment based on mental illness may be ordered for up to 180 days in an initial commitment proceeding. ORS 426.130(2). At the end of that period, if the person's status has not been changed to voluntary, the person "shall be released," unless the Oregon Health Authority certifies "that the person is still a person with mental illness and is in need of further treatment." ORS 426.301(1). If certification occurs, the person has the opportunity to "protest further commitment." ORS 426.301(5). Protesting further commitment triggers a hearing. ORS 426.303. After the hearing, the court must "determine whether the person is still a person with mental illness and is in need of further treatment." ORS 426.307(6). If so, the court may order commitment to continue for an additional indefinite period up to 180 days. Id .
In this case, the trial court determined that appellant was still a person with mental illness, specifically a mental disorder that made him dangerous to others, and was in need of further treatment. See ORS 426.005(1)(f)(A) (a "person with mental illness" includes someone who, "because of a mental disorder," is "dangerous to * * * others"). Appellant does not contest having a mental disorder. However, " ORS 426.005 precludes a court from committing a person on the basis of a mental disorder alone." State v. S.D.M. , 198 Or. App. 153, 161, 107 P.3d 683 (2005). The person must have "mental illness" within the meaning of ORS 426.005(1)(f), which, in this case, means that the state had to prove that appellant *718 was still dangerous to others, as a result of his mental disorder, at the time of his recommitment hearing. "To justify continued commitment on the 'danger to others' ground, the state must do more than establish that appellant was dangerous to others at one time." State v. D. S. , 243 Or. App. 328, 333, 258 P.3d 1250 (2011). "[I]t must establish a factual foundation to predict appellant's future dangerousness based on his condition at the time of the hearing in the context of his history." Id .
The state argues that the evidence was sufficient to establish appellant's ongoing dangerousness to others. In particular, it points to (1) appellant's attempt to break into his family home in May 2017, which he has a delusion that he owns, and the risk of his doing so again, because that delusion persisted at the time of the recommitment hearing; (2) the incident with the police in May 2017, during which appellant had a fake gun that looked real and behaved in an unspecified manner that led police to shoot at him; and (3) appellant's behavior at Unity in June 2017, "saying that he was a police officer and [pointing] his finger at people and pretend[ing] to shoot." We agree with appellant that that evidence was insufficient to establish that he was still dangerous to others at the time of his recommitment hearing in November 2017.
Read, who was not present for any of the foregoing incidents,[2] provided little information about them. Regarding appellant's attempt to break into the family home in May 2017, that incident could be of particular relevance, given appellant's ongoing delusional belief that he owned that home at the time *127 of the recommitment proceeding, except that there was no evidence that appellant acted violently towards anyone in the home or made any threats during the incident. An attempted break-in could involve violence or threats, but there was no evidence that it did here, let alone enough evidence to allow a prediction *719 of future dangerousness. See State v. L. R. , 283 Or. App. 618, 625, 391 P.3d 880 (2017) ("Even evidence of past violent acts must provide a foundation to predict future dangerousness, not merely describe past isolated incidents.").
As for the police incident, appellant's conduct created an immediate danger to himself, as evidenced by his being shot at, and he was obviously perceived by the police as posing a danger to others, as he possessed what looked like a gun and failed to follow orders, but the fact remains that the gun was fake. The statute requires that appellant be dangerous to others-it is not enough that he was incorrectly perceived as dangerous on a particular occasion. Lastly, claiming that you are a police officer and pretending to shoot people with your finger while in a mental hospital is abnormal behavior, but it does not endanger anyone. See id . ("For the state to prove that actual future violence by the appellant is highly likely, it will generally have to provide evidence that shows that the appellant's threats of future violence are accompanied by an overt act demonstrating an intention and ability to carry out the threats or other circumstances indicating that actual future violence is highly likely.").
That leaves two additional pieces of evidence on which the state does not rely on appeal but which the trial court could have and so we address. Read testified that appellant's only history of threatening behavior was when he was off his medications. Asked to describe that history, Read responded, "Well, there was things in the past that included blowing up a dam and some things like that." He gave no further information and no time period, which is particularly significant given appellant's long period of stability at Alberta Place. A vague and grandiose threat at some unknown time in the past adds little to the danger-to-others analysis. See id. at 626, 391 P.3d 880 ("Although [the appellant] made threats of harm, no evidence was presented that appellant had harmed anyone, had attempted to harm anyone, or that any of his broad, vague threats would or could have been carried out.").
The only other potentially relevant evidence was testimony by Read that appellant's mother obtained a restraining *720 order against appellant in August 2016, which expired in 2017, after an unspecified "assault" on mother. On appeal, appellant argues that Read's testimony was inaccurate hearsay. He asks us to take judicial notice of Oregon court records showing that appellant's mother actually obtained a restraining order against appellant's brother in August 2016, not appellant, and that the only restraining order that appellant's mother ever obtained against appellant was long ago in 2000. We need not decide whether it is appropriate to take judicial notice of that information because, in any event, bare evidence that appellant's mother obtained a restraining order against appellant in 2016 is of minimal significance. It is unknown on what basis any restraining order was sought, whether it was contested, or why it was granted. Reference to an "assault" is concerning. But "assault" means different things to different people, and the standard for a restraining order is not the same as the standard for involuntary civil commitment. That is, even if one meets the standard to obtain a restraining order against someone with a mental disorder, it does not necessarily follow that the restrained person qualifies to be involuntarily civilly committed or recommitted.
We recognize the difficult situation that the state was in. Read essentially testified that appellant was ready for release but for the inability to find him a placement in a supervised setting with medication reminders before his commitment expired. The trial court implicitly found that, because of his mental disorder, appellant was unlikely to stay on his medications without support, regardless of his intentions. Having successfully stabilized appellant after 180 days in the hospital, the state faced the prospect of having to release him, without an appropriate placement, and risk that he would stop taking *128 his medications and end up back at square one.
Nonetheless, the legal standards for civil commitment derive from statute and reflect the significant liberty interests at stake. The determination of mental illness must be "based upon clear and convincing evidence," ORS 426.130(1)(a), which is a "rigorous" standard of proof that requires "evidence that is of extraordinary persuasiveness, *721 and which makes the fact in issue highly probable." State v. J. T. C. , 284 Or. App. 38, 39, 392 P.3d 754, rev. den. , 361 Or. 645, 398 P.3d 42 (2017) (citation omitted). The evidence in this record was insufficient for the trial court to find that appellant was still dangerous to others within the meaning of ORS 426.005 (1)(f)(A) at the time of his recommitment hearing in November 2017.
Reversed.

Read described the circumstances leading to appellant's initial commitment during his testimony at the recommitment hearing. Nothing from the initial commitment proceeding was put into the evidentiary record of the recommitment proceeding. See State v. C.H. , 179 Or. App. 563, 565 nn. 3 & 4, 41 P.3d 434 (2002) (addressing the scope of the evidentiary record in a commitment or recommitment proceeding, including that "[i]nitial commitment and further commitment are distinct proceedings" and that "the record of the former is not automatically incorporated into the record of the latter").

Appellant's counsel made two hearsay objections during Read's testimony, which the trial court overruled. In context, it appears that the court may have intended to admit at least some of Read's testimony only as relevant to understanding the basis for Read's opinions, not for the truth of the matter asserted. However, the record is not clear. Because it does not affect our disposition, we assume for purposes of discussion that Read's testimony was admitted for all purposes.