Submitted July 3, 2018, reversed November 14, 2019

In the Matter of M. B.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

M. B.,
*Appellant.*

Multnomah County Circuit Court
17CC04251; A165589

452 P3d 1006

The trial court found that appellant is unable to provide for her basic personal needs and, under ORS 426.130(1)(a)(C) and ORS 426.005(1)(f)(B), civilly committed her to the Oregon Health Authority for a period not to exceed 180 days. Appellant appeals, arguing that the evidence was insufficient to support the finding. The record shows that appellant was found naked outside of a bar. She was dirty, had minor cuts on her recently-shaven head, and made nonsensical statements to a police officer. She was taken to a hospital, where she told an investigator that she could not obtain food stamps because she had lost her identification, made many nonsensical statements, and engaged in some bizarre behavior. At her civil commitment hearing, appellant lacked a clear post-release housing plan. *Held*: The evidence as a whole was insufficient to civilly commit appellant based on inability to meet basic personal needs under ORS 426.130(1)(a)(C) and ORS 426.005(1)(f)(B).

Reversed.


Monica M. Herranz, Judge pro tempore.

Jed Peterson and O'Connor Weber LLC filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Judy C. Lucas, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, and Aoyagi, Judge, and Hadlock, Judge pro tempore.

AOYAGI, J.

Reversed.

**AOYAGI, J.**

Appellant seeks reversal of a judgment committing her to the Oregon Health Authority for a period not to exceed 180 days. She argues that the evidence was insufficient to support the trial court's finding that she was unable to provide for her basic personal needs, which is a basis for commitment under ORS 426.130(1)(a)(C) and ORS 426.005 (1)(f)(B). We agree with appellant and, accordingly, reverse.

Unless we exercise our discretion to review *de novo*—which we do not in this case—we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. T. W. W.*, 289 Or App 724, 726, 410 P3d 1032 (2018) (internal quotation marks omitted). We describe the facts in accordance with that standard.

Officer Ibrahim was dispatched to a local bar after the police received multiple calls that a woman was harassing customers outside the bar. It was mid-July and around 8:00 p.m. Upon arrival, Ibrahim observed appellant standing fully naked on the side of the street. When he got out of his car, appellant put her shirt on, although she later took it off again (and then put it on again at his request). A woman standing next to appellant told Ibrahim that she knew appellant from high school and that appellant was "not being herself." Ibrahim observed that appellant was dirty, "basically didn't have any hair," and had minor cuts on her head. Appellant appeared not to know exactly where she was. She talked about "an invisible dog that was not there" and pointed at things that were not there. Appellant told Ibrahim that she had taken Xanax. Believing her to be at risk, Ibrahim called an ambulance to take appellant to the hospital. He thought, based on her appearance and behavior, that she was suffering from some sort of mental health issue and was a danger to herself and not able to "care for herself."

Appellant was hospitalized. On her first night at the hospital, she told the precommitment investigator that she had not been eating well, had been hungry, and had

lost weight. She explained that she had been unable to get food stamps because she lost her identification. She also said that she had no current income. The next day, the investigator found appellant to be "significantly worse." Appellant made many "nonsensical statements" and engaged in "flight of ideas." She acknowledged to the investigator that she had defecated on the floor of her hospital room because she "had to go" and the bathroom smelled bad. She also acknowledged having put medication up her rear end and in her vagina and then offered it to the security guard, and she acted as if that was "perfectly reasonable" conduct. Appellant told the investigator that she was sorry about having shaved her head and wanted to grow her hair long again; she said that her head hurt from a sunburn, and the investigator noted that it was quite red.[1]

A civil commitment hearing was held in July 2017. The state sought civil commitment under ORS 426.130 (1)(a)(C) and ORS 426.005(1)(f)(B), based on appellant being unable to provide for her basic personal needs. No other bases for commitment were asserted.

Ibrahim testified about the circumstances of appellant's hospitalization, as described above, and then appellant testified. Appellant testified that she "[didn't] really know" why she was in the hospital. She said that she must have been "dehydrated" or had "a bug." Asked how she would obtain money if released, appellant said that she could be a Playboy Bunny for Hugh Hefner. Shortly thereafter, appellant spontaneously said—seemingly not in response to the pending question—that she was "tired of people beating [her] ass" and that, while she was "walk[ing] down the street one day to get [her] shoes back," a man once threw her down

---

[1] The facts in this paragraph are from the precommitment investigator's report. The trial court appears to have admitted that report "absent any hearsay," at the parties' request, but it is unclear which specific parts of the report the trial court meant to exclude. In particular, because the report is divided into sections labelled "first-hand" and "hearsay," it is unclear whether the trial court intended to exclude only those sections *labelled* as "hearsay" or intended to exclude everything that actually *is* hearsay under the applicable evidentiary rules, regardless of how the investigator labelled it. The state cites these facts on appeal, they appear in a section of the report labelled "first-hand," and appellant has not challenged their consideration on appeal. In any event, the inclusion of these facts does not affect the disposition in this case.

and severely hurt her back and, when she woke up, a woman was "beat[ing] the bug out of [her]" and "cracked [her] in the head." Later, appellant said that she thought she had border-line personality disorder but "[didn't] even know what any of that stuff is really." She said that she did not want to be in a psychiatric hospital, preferred to be outside, and was "not a psychopath." Asked where she would go if released, appellant said that she would "march right over there to Tyler's house," or, "could go to John's house if somebody would call him." During the hearing, appellant was drinking from a water bottle with a banana peel in it, which she explained was for extra potassium. Appellant made many nonsensical statements throughout her testimony. She could not recall why she had been naked outside the bar.

Examiner Edelson gave her report to the court, which contained diagnostic impressions of psychosis not otherwise specified and methamphetamine-induced psychosis. (Appellant had tested positive for amphetamines when she arrived at the hospital.) Edelson listed appellant's symptoms as "visual hallucinations, tangential, flight of ideas, delusions, grandiose." She reported that appellant "[c]annot answer direct questions in a meaningful way" and that "her only organized statement" was her "clear" statement that she wanted to be released. Edelson found that appellant had "no insight into being naked downtown [and] no explanation for her behavior" and that she "is too disorganized to plan and follow through [with outpatient] care or even shelter." As for Rogers, he noted that appellant "had no realistic or rational plan should she be released." Rogers opined that appellant was "clearly still psychotic to the point that she would be at a grave risk if discharged due to being unable to care for her basic needs."

At the end of the hearing, the trial court determined that appellant had a mental disorder that made her unable to provide for her basic personal needs. On that basis, the court civilly committed her for a period not to exceed 180 days. On appeal, appellant challenges the sufficiency of the evidence to support the commitment.

Under ORS 426.130(1)(a)(C), if, after hearing all the evidence at a civil commitment hearing and reviewing the

findings of the examiners, the court finds, based on clear and convincing evidence, that a person is "a person with mental illness," and release or conditional release is not in the person's best interest, the court may order the person to be committed. ORS 426.005(1)(f)(B) defines a "[p]erson with mental illness" to include a person who, because of a mental disorder, is "[u]nable to provide for basic personal needs that are necessary to avoid *serious physical harm in the near future*, and is not receiving such care as is necessary to avoid such harm." (Emphasis added.) *See also State v. M. A.*, 276 Or App 624, 631, 371 P3d 495 (2016) (citing food, water, and life-saving medical care as examples of basic personal needs).

As we recently discussed in *State v. M. A. E.*, 299 Or App 231, 232, 237, 448 P3d 656 (2019), the legislature amended ORS 426.005(1)(f)(B) in 2015, resulting in the current standard for a basic-needs commitment, which became effective on January 1, 2016. Under the current standard, "serious physical harm" means a nonspeculative threat that the person will not safely survive without treatment, and "in the near future" means something less immediate than "imminent" but not so attenuated from present circumstances as to render it speculative. *Id.* at 239-40.

"Whether the evidence presented by the state is legally sufficient to support a civil commitment is a question of law." *State v. A. D. S.*, 258 Or App 44, 45, 308 P3d 365 (2013). In this case, appellant does not contest that she has a mental disorder, but she argues that there was insufficient evidence that her mental disorder makes her unable to provide for her basic personal needs. The state defends the commitment, emphasizing that appellant was dirty, hungry, and thin when she arrived at the hospital and that she lacked any organized post-release plan.

As relevant to the issue before us, the record contains evidence that appellant had lost weight over an unspecified time period, lacked a current source of income, was presently unable to obtain food stamps due to having lost her identification, had a sunburn and minor cuts on her head, had been found naked on a public street, and lacked a clear post-release housing plan. We address each of those pieces

of evidence in turn, while emphasizing that we ultimately must look at the record *as a whole* to determine whether the evidence was sufficient for commitment. *See M. A. E.*, 299 Or App at 241 (affirming judgment of commitment based on the record "[v]iewed as a whole"); *M. A.*, 276 Or App at 632 (reversing judgment of commitment based on "the totality of the circumstances").

With respect to the evidence related to food, the record shows that appellant had struggled, at least recently, with obtaining adequate food, but it does not establish that appellant's challenges in obtaining food had reached the point of putting her at risk of serious physical harm in the near future. For example, there was no evidence that appellant was at a medically dangerous weight when she arrived at the hospital, that she did not have access to shelters or soup kitchens, or that she would be unable to replace her identification so that she could obtain food stamps. *Cf. M. A. E.*, 299 Or App at 241-42 (affirming commitment where record showed that, if released, appellant would stop taking her medication and, "in no more than a week, become unable to obtain food, even if she might wish to eat").[2] As for appellant's health more generally, appellant had a sunburn and minor cuts on her head, which do not appear to have been considered medically concerning. *Cf. State v. C. K.*, 300 Or App 313, 318, 451 P3d 243 (2019) (affirming commitment where record showed that, if released, appellant "would lack the capacity to care for her ostomy site due to her mental disorder and memory lapses," which, "in turn, would place her at a nonspeculative risk of a serious life-threatening infection—one that could lead to organ failure—in the near future").

With respect to appellant's nudity outside of the bar on the day that she was hospitalized, the incident occurred

---

[2] Because of the highly fact-specific and context-specific nature of civil commitment, we generally discourage fact-matching between cases. *State v. C. A. J.,* 230 Or App 224, 232, 213 P3d 1279, *rev den,* 337 Or 446 (2009). Older decisions also must be discussed with caution because of the 2009 statutory change to the *de novo* standard of review, *see State v. D. R.*, 239 Or App 576, 578 & n 3, 244 P3d 916 (2010), and the previously-mentioned 2016 statutory change to the basic-needs standard in ORS 426.005(1)(f)(B). Nonetheless, past decisions can illustrate certain principles.

in the summer, so there does not appear to have been any risk of appellant suffering serious physical harm from weather exposure (nor does the state argue that there was). As for the risks inherent in a woman with a mental disorder wandering naked in public, there is no evidence that appellant made a regular habit of public nudity, or of a non-speculative risk of harm to appellant specifically. *See State v. B. C.*, 235 Or App 412, 415, 233 P3d 445 (2010) (reversing commitment in case where the appellant was found wandering in the road "partially unclothed"); *State v. T. S. W.*, 186 Or App 404, 406, 409-10, 63 P3d 1258 (2003) (reversing commitment in case where the appellant was found riding her bicycle naked in near-freezing weather and professed to believe in "a truly clothing-optional world," and where a doctor and the examiner expressed concern about "the potential danger of assault" but "could [not] offer more than the vague unease about the possibility of harm").

Finally, as to the evidence that appellant lacked a specific housing plan post-release and currently lacked income to pay rent, the record is at best unclear as to whether appellant had friends with whom she could stay. But even if appellant was too disorganized to arrange shelter due to her mental disorder, and therefore was at risk of ending up homeless, we have repeatedly said that homelessness itself is not grounds for civil commitment. *E.g.*, *State v. Baxter*, 138 Or App 94, 99, 906 P2d 849 (1995) ("Although the lack of certain shelter is not a good plan, we cannot say that homelessness by itself is sufficient grounds for commitment."); *State v. A. M.-M.*, 236 Or App 598, 238 P3d 407 (2010) (quoting same). Although living on the streets may be inherently dangerous, such a generalized risk is not enough to justify involuntary civil commitment. Nothing in this record supports a finding that appellant personally is at risk of serious physical harm in the near future due to her lack of a specific housing plan.[3]

---

[3] In its answering brief, the state briefly refers to appellant having "stated that she had been victimized by others repeatedly on the street." The state appears to be referring to appellant's testimony about an incident in which she was "walking down the street," a man threw her down and hurt her back, and she awoke to a woman who "beat the bug out of [her]" and "cracked [her] in the head." That testimony appears to refer to a single incident, there is no evidence

Having considered the evidence in the record both individually and collectively, we conclude that it was insufficient to support the court's finding that appellant was unable to provide for her basic personal needs within the meaning of ORS 426.005(1)(f)(B). Notably, at appellant's hearing, no one identified any specific threat to appellant's well-being, instead indicating a generalized concern that public nudity, combined with outward manifestations of mental illness, would leave appellant vulnerable. Such concern for appellant's welfare is certainly understandable and might be well-founded, but it does not meet the legal standard for involuntary civil commitment, at least on this record. *See State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999) ("Apprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment."); *see also T. S. W.*, 186 Or App at 410 (mental health professionals' "vague unease about the possibility of harm" did not justify civil commitment).

Nor can we simply defer to Rogers' opinion that appellant is "clearly still psychotic to the point that she would be at grave risk if discharged due to being unable to care for her basic needs." That is "a conclusory assertion that reflects the legal question at issue, rather than evidence of what actually will happen to appellant if [appellant] is released." *State v. S. T.*, 294 Or App 683, 686, 432 P3d 378 (2018) (reversing civil commitment order, despite the examiner's statement that he did not "'think [that appellant] will survive out there"). On this evidentiary record, we reverse.

Reversed.

---

as to how recently or long ago it occurred, and it is unclear whether appellant was even homeless at the time.