No. 426 May 14, 2025 473

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. M. W.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

A. M. W.,
*Appellant.*

Marion County Circuit Court
24CC02379; A184553

Matthew L. Tracey, Judge pro tempore.

Submitted March 18, 2025.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Elise Josephson, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

AOYAGI, P. J.

Reversed.

**AOYAGI, P. J.**

Appellant was committed to the custody of the Oregon Health Authority for a period not to exceed 180 days, based on her having a mental disorder that caused her to be unable to provide for her basic needs and to be a danger to others. On appeal, she does not contest that she has a mental disorder (schizophrenia), but she challenges the sufficiency of the evidence to establish inability to meet basic needs or dangerousness. She asks that we reverse the judgment of commitment and related firearms order. We agree that the evidence was legally insufficient and, accordingly, reverse.

Appellant has not requested *de novo* review but, rather, challenges the sufficiency of the evidence as a matter of law. Our task, therefore, is to view the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's disposition and determine whether the evidence was legally sufficient to support civil commitment. *State v. L. R.*, 283 Or App 618, 619, 391 P3d 880 (2017). Whether the evidence was legally sufficient to support civil commitment is a question of law. *State v. A. D. S.*, 258 Or App 44, 45, 308 P3d 365 (2013). "Ultimately, in view of the clear-and-convincing-evidence standard of proof that applies in civil commitment proceedings, the question for us as the reviewing court is whether a rational factfinder could have found that it was highly probable that appellant was a danger to herself or others," or unable to provide for her basic needs, as a result of a mental disorder. *State v. S. A. R.*, 308 Or App 365, 366, 479 P3d 618 (2021) (internal quotation marks omitted).

## INABILITY TO MEET BASIC NEEDS

A person who has a mental disorder that causes them to be "[u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm," ORS 426.005(1)(f)(B), may be involuntarily committed under ORS 426.130(1)(a)(C). Food, water, and medical care are examples of basic personal needs. *State v. M. A.*, 276 Or App 624, 631, 371 P3d 495 (2016). To meet the

standard, "the state must prove two things: (1) that the individual's inability to provide for their basic personal needs puts them at a nonspeculative risk of serious physical harm and (2) that the serious physical harm is likely to occur in the near future." *State v. P. D.*, 333 Or App 738, 742, 553 P3d 1063 (2024) (internal quotation marks omitted). As to the second requirement, which is a temporal requirement, "the evidence must establish not only that a person's inability to attend to a basic need risks the person suffering an adverse medical consequence, but also *how soon* that adverse consequence is likely to occur." *State v. R. L. M.*, 309 Or App 545, 550, 482 P3d 201 (2021) (emphasis in original).

Here, before her commitment, appellant was living on the streets, as it was not feasible for her family to house her given her behavior. Appellant was frequently found to be covered in her own urine and feces, poorly clothed, thirsty, and hungry—and she did not discriminate between spoiled and fresh foods in terms of eating anything that came to hand. On one occasion, appellant's mother found her sitting in the dirt "in the middle of the beating sun, red, with no food or water" and, on another occasion, lying face down on the concrete in front of a Walgreens eating frosting from an unknown source. Two weeks before the commitment hearing, the civil commitment investigator met appellant at a motel. Appellant was disheveled, her pants "were barely hanging on by a shoestring," and she kept going outside in 40-degree weather without shoes on such that her "feet were purple." Appellant could not seem to comprehend the investigator's requests that she put on shoes. The investigator met with appellant again on the day of the hearing and found her jail cell to be "[v]ery messy" and "malodorous," with what appeared to be urine on the floor.

Viewed in the light most favorable to the state, the foregoing evidence, while painting a tragic picture of appellant's life with schizophrenia, was not enough to permit the trial court to conclude that appellant faces a nonspeculative risk of serious physical harm that is likely to occur in the near future, for purposes of a basic-needs commitment under ORS 426.005(1)(f)(B). Although it is unclear how she obtains food, appellant is not food adverse, and there is no evidence

that she is malnourished or underweight. (The record shows that appellant is five feet eight inches tall and weighed 145 pounds when taken into custody a week before the commitment hearing.) Indeed, the record shows that appellant eats whenever food is available and eats heartily when her family buys her meals. Appellant's willingness to eat spoiled food, such as spoiled fruit found in her sister's car, may put her at some risk of harm, as it is common knowledge that eating spoiled food poses some health risks, but there is no evidence of the severity or likelihood of any such harm on this record. As for hydration, appellant was once observed with chapped lips, a condition for which one possible cause is dehydration, but there is no evidence of water avoidance or a history of dangerous dehydration.

There was simply insufficient evidence for the trial court to conclude that appellant's eating or drinking habits put her at risk of serious physical harm in the near future. *See State v. C. H.*, 306 Or App 63, 68, 473 P3d 60 (2020) (concluding that the appellant's eating habits did not support a basic-needs commitment, where there was no evidence that she "was malnourished, losing weight, or that there was a risk of any other serious physical harm in the near future as a result of her failure to obtain food"); *State v. M. B.*, 300 Or App 522, 527, 452 P3d 1006 (2019) ("With respect to the evidence related to food, the record shows that appellant had struggled, at least recently, with obtaining adequate food, but it does not establish that appellant's challenges in obtaining food had reached the point of putting her at risk of serious physical harm in the near future.").

As for the observed instances of appellant going outside barefoot in cold weather or not protecting herself from the sun in hot weather, there is no evidence that she has suffered any actual harm from such disregard of weather conditions or, more importantly, that her failure to adequately protect herself from exposure to the natural elements is at a point where it puts her at nonspeculative risk of serious physical harm occurring in the near future. *Cf. M. B.*, 300 Or App at 527 ("[A]ppellant had a sunburn and minor cuts on her head, which do not appear to have been considered medically concerning.").

We therefore conclude that the evidence was legally insufficient for a basic-needs commitment.

DANGER TO OTHERS

We next consider whether appellant was proved to be dangerous to others. A person who is "[d]angerous to self or others" as a result of a mental disorder, ORS 426.005(1)(f)(A), may be involuntarily committed under ORS 426.130(1)(a)(C). "Although 'dangerous' is a common term that, in ordinary usage, may refer to a broad range of threats, the type of 'danger' necessary to justify an involuntary civil commitment is a narrow range of serious and highly probable threats of harm." *State v. S. R. J.*, 281 Or App 741, 749, 386 P3d 99 (2016).

Determining whether someone is dangerous for civil commitment purposes is a predictive exercise. The state must establish "a factual foundation to predict appellant's future dangerousness based on [her] condition at the time of the hearing in the context of [her] history." *State v. M. G.*, 296 Or App 714, 718, 440 P3d 123 (2019) (internal quotation marks omitted). "[E]vidence of past violent acts must provide a foundation to predict future dangerousness, not merely describe past isolated incidents." *L. R.*, 283 Or App at 625. And an "empty threat that is not likely to be carried out, even if disturbing or distressing, is not a basis for involuntary civil commitment." *State v. C. A. C.*, 330 Or App 653, 660, 545 P3d 158 (2024). Again, the threat of harm must be "serious and highly probable." *S. R. J.*, 281 Or App at 749. The state must prove "that actual future violence is highly likely." *M. A.*, 276 Or App at 629 (quoting *State v. L. D.*, 247 Or App 394, 400, 270 P3d 324 (2011)).

As for the type of harm at issue, in the context of danger-to-self commitments, we have construed "dangerous" to refer to "actual," "serious," "physical" harm. *State v. B. B.*, 240 Or App 75, 82-83, 245 P3d 697 (2010) (explaining that conduct is "dangerous" for purposes of a danger-to-self commitment if the conduct is "likely to result in physical harm," which "must, at minimum, involve actual physical harm" that is "serious" (internal quotation marks omitted)). Appellant argues that "dangerous" should be construed the same as to others as it is as to self, particularly given

the unitary phrase "[d]angerous to self or others" in ORS 426.005(1)(f)(A). The state disagrees. We need not resolve in this case, however, whether the type and degree of danger that one must pose to others to be involuntarily committed is exactly the same as the type and degree of danger that one must pose to oneself to be involuntarily committed. The alleged danger to others posed by appellant in this case was physical harm.[1] As to physical harm, even if less "serious" harm might support a danger-to-others commitment than a danger-to-self commitment, there would need to be evidence, at least, of a high likelihood of appellant engaging in conduct that is likely to cause some physical injury or pain to others.

In this case, there was evidence that appellant has erratic moods, with her cycling between laughing, crying, grief, and anger. She yells and screams. She has frequently said to her sister that she is going to hit or kill her; she says, "I'll hit you. I'll murder you." For example, on one occasion, appellant's sister tried to secure appellant's seat belt after retrieving her in response to a police call, and appellant threatened to kill her for doing so, so she drove appellant home without a seat belt. The most recent (unspecified) statement of that nature was made about a week before the commitment hearing, when appellant was unhappy with her sister telling her that it was time to get out of the bath at their mother's house.

There was also evidence of two incidents of appellant getting physical with someone. Seven weeks before the hearing, appellant's sister took appellant camping to try to help her level out in a safe place. Appellant's sister was sitting in a chair, and appellant affectionately hugged her with her legs, then put their foreheads together, which was "like a weird thing." The sister made a comment about it, which seemed to anger appellant, and which the sister thought might explain a later incident in the tent:

"[T]here was an instance in the tent where she grabbed me by the neck and tried to push me and throw me on the bed. And you know, I'm trying to get away, and you know, she's got me. She's a little bit stronger than you think.

[1] In *C. A. C.*, 330 Or App at 663, we left open whether harms other than physical harm, such as "a danger of psychological harm," are encompassed in the "dangerous to self or others" standard for civil commitment.

"And eventually I'm able to tuck under and push myself out of the door of the tent. And she follows me out of the tent, but I just kind of, like, not react and avoid eye contact to not give her any fuel. And then that seemed to kind of work[] a little bit, but she still was just, like, walking in circles around me and being very aggravated."

The second known incident of physicality occurred a week before the hearing, when appellant was taken into police custody on a detainer from her probation officer. Appellant was sitting in her mother's car eating food and did not respond to the officers' efforts to verbally engage her. The officers eventually gave up on talking to her and physically pulled her out of the car. Appellant "started to tense up" and "was pulling her arms, trying to twist away." She did not attempt to strike anyone; the officers had "full control of her arms." Once out of the car, while being patted down and handcuffed, appellant "started to spit her chicken McNuggets at" an officer.

We conclude that the foregoing evidence was legally insufficient to establish the requisite dangerousness to others to support involuntary commitment.

The only reasonable inference from the evidence is that appellant's frequent verbal threats are the means that she uses to communicate her displeasure, particularly to her family. There is no evidence that she has ever followed through on any verbal threat, and, notably, the two incidents of actual physicality were unconnected to any verbal threats. *Cf. L. D.*, 247 Or App at 400 (holding that the evidence was legally insufficient to support a danger-to-others commitment where the appellant made verbal threats to "destroy" his family members and later, unrelatedly, pushed his son on a single occasion). An "empty threat that is not likely to be carried out, even if disturbing or distressing, is not a basis for involuntary civil commitment." *C. A. C.*, 330 Or App at 660.

The real question is whether the camping and police incidents were enough to establish dangerousness, *i.e.*, whether that evidence was legally sufficient to permit a finding that it was highly probable that appellant would engage in violence against others in the future. We conclude

that they were not. Regarding the police incident, appellant tensing her body and attempting to twist away from police restraint is a classic example of conduct that has little weight in predicting dangerousness. *See S. R. J.*, 281 Or App at 754 ("As we recently emphasized in *M. A.*, [276 Or App at 630], 'we have consistently held that evidence of a struggle with arresting officers is legally insufficient to permit the conclusion that a person is a danger to himself or others.'"). As for her spitting food at an officer, spitting at someone can potentially spread disease and can even be a crime. *See* ORS 166.070(1)(c) (making it a Class C felony to intentionally propel saliva at a police officer performing official duties, if the saliva "comes into physical contact" with the officer). However, even assuming *arguendo* that someone could be civilly committed as dangerous to others based on a high likelihood of spitting on others in the future, appellant spitting food at an officer once while reacting to being restrained and arrested is not predictive of a high likelihood of future spitting on others.

The camping incident is much more potentially telling, because it occurred under everyday circumstances. The testimony regarding that incident was minimal, however, and does not establish that appellant's sister was at risk of actual physical harm. Although no doubt distressing, it appears to have been a spontaneous and relatively brief struggle, and there is no indication that appellant's sister suffered any physical injury or pain. Moreover, on this record, it was an isolated incident, as there was no evidence of any prior or subsequent physical aggression by appellant in everyday life.

Considered together, appellant's frequent empty verbal threats, the isolated act of aggression toward her sister while camping, and her spitting food at a police officer while being restrained and taken into custody were legally insufficient to establish that appellant is dangerous to others.[2] That is, the evidence was insufficient to establish a high

---

[2] We note that there was testimony from appellant's sister that, approximately three months before the commitment hearing, she was giving appellant a ride and let appellant smoke cigarettes in the car. She smelled "smoke" or "burning" at one point, realized that appellant had "just put the cigarettes on *** [a] McDonald's wrapper," and pulled over. That was the totality of the testimony

probability that appellant would engage in conduct likely to cause physical injury or pain to others in the future, as a result of her mental disorder.

## CONCLUSION

It is readily apparent from the record that appellant has a serious mental illness that has impacted every aspect of her life and that her situation has been extremely hard on her mother and sister, who have tried to support and care for her as best they can under the circumstances. Any rational person would see the tragedy of appellant's situation and wish for her to receive psychiatric help to better her life. However, involuntary civil commitment by the state is subject to strict legal standards, and the evidence presented at appellant's commitment hearing was insufficient to meet those standards. Accordingly, we must reverse.

Reversed.

---

about that incident. At the commitment hearing, in support of a basic-needs commitment, the state pointed to that incident as evidence that appellant "could not be left alone" due to the risk of her setting an accidental fire. On appeal, the state no longer makes that argument but briefly cites that incident as evidence of danger to others. We are unpersuaded that the accidental-smoking-wrapper incident is significant to the danger-to-others analysis.